[No. E020267. Fourth Dist., Div. Two. Feb. 17, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
KAREN LOIS CULUKO et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III, VII, and X.

## COUNSEL

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant Karen Lois Culuko.

Kevin C. McLean, under appointment by the Court of Appeal, for Defendant and Appellant Leslie Eugene Garcia.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Esteban Hernandez and Nancy L. Palmieri, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RICHLI, J.**—Somebody killed seven-month-old José (Joey) Galindo, Jr., by hitting him in the stomach. The blow was so hard that it ruptured an artery at the back of his abdomen, and he died of internal bleeding. At various earlier times, somebody had broken his leg and four of his ribs, smashed him in the face, and shaken his head so violently that the resulting bleeding in his brain might have killed him if the bleeding from the ruptured artery had not killed him first.

The person who hit and killed Joey had to be either defendant Karen Lois Culuko, who was his mother, or defendant Leslie Eugene Garcia, who had moved in with Culuko two months earlier. The person who inflicted Joey's other injuries could have been the one who killed him, the other one, or both.

Defendants were charged with murder (Pen. Code, §§ 187, subd. (a)), fatal assault on a child under the age of eight (Pen. Code, § 273ab), and felony child abuse (Pen. Code, § 273a, subd. (a)). The jurors were instructed that if (1) one defendant aided and abetted the commission of felony child abuse by the other, (2) the defendant who committed felony child abuse committed murder, and (3) murder was a natural and probable consequence of the commission of the crime of felony child endangerment, the aider and abettor was guilty of murder. The jurors were also instructed that they did not have to decide individually, nor agree unanimously, as to whether either defendant was guilty as a perpetrator or as an aider and abettor. Both defendants were found guilty as charged; the murder was set as second degree. Defendants were sentenced to 19 years to life in prison.

Defendants raise a host of challenges to their convictions. Most of these seek to capitalize on the fact that it is hard to feel sure which defendant actually struck the fatal blow; many of them revolve around the jury instructions summarized above. We will conclude, however, that the jury was properly instructed, and, based on those instructions, could properly find both defendants guilty on all charges. Accordingly, we will affirm.

## I

### FACTUAL BACKGROUND

A. *The Arrival at the Medical Clinic.*

On Friday, January 26, 1996, about 8:40 a.m., Culuko entered Colton Community Family Health, a medical clinic. She said her baby, who was outside, had fallen, was fussy, and would not eat. She was told to bring him in.

About five minutes later, she came back. She was crying and clutching the baby to her chest. She said he was not breathing. His body was "bluish-gray."

At first, Culuko said the baby had fallen off her bed. Later, she said he had fallen from his crib a few days earlier and hit his head. Still later, she repeated that he had fallen from a bed. She explained that, the day before, he had not eaten well; he had been awake most of the night. Just as they got to the clinic, he had stopped breathing.

Garcia came into the clinic. He appeared calm. When asked if he was the father, he said no, he had just given Culuko a ride.

About 8:50 a.m., clinic personnel began administering CPR to the baby. There were "a lot of bruises and marks all over his body" and dried blood on his feet. He had no pulse. His pupils did not react to light. His body was limp, blue, and cool. From his temperature, Dr. Elisabeth Richards concluded he had stopped breathing more than 30 minutes earlier.

Paramedics transported the baby to Loma Linda Medical Center. At 9:12 a.m., he was seen by Dr. John Jones. He had multiple bruises, in various stages of healing, on his face, chest, arms, legs, genitals and both feet. There had been bleeding in the white of his right eye; his frenulum[1] was torn. By 9:40 a.m., Loma Linda personnel noted rigor mortis in his arms and legs as well as postmortem dependent lividity. Dr. Jones concluded that, at that point, the baby had been dead for at least two hours.

B. *The Physical Evidence.*

Dr. Frank Sheridan, who performed the autopsy, believed Joey had been dead at least an hour or two before he arrived at the clinic. About two hours

---

[1] An expert witness defined the frenulum as "that little fold on the inside of your upper lip you can feel in the middle if you run your tongue across it."

after death, rigor mortis would have begun. Because it was noted in the arms and legs by 9:40 a.m., and it begins even earlier in the face, Dr. Sheridan believed it had already begun at the clinic, although clinic personnel did not note it because they were focused on resuscitation.

Joey died of internal bleeding from a ruptured artery at the back of the abdomen. It would have taken "[m]ajor force, like a violent punch," to rupture this artery. After the blow, ". . . you have a time frame from instantaneous up to a couple of hours . . . for the artery to rupture." Then, after the rupture, death would have occurred within one hour. In sum, Joey died "[a]t the outside, about three hours" after the blow. Dr. Sheridan concluded the blow had been struck sometime after 3:45 a.m.

Joey's body was covered with bruises. On his face alone, there were bruises on the forehead, both eyes, nose, right cheek and mouth. There was "extensive injury to the inside of the mouth," including the torn frenulum. He had four broken ribs. They were the result of at least two separate blows, in addition to the later blow which had ruptured the artery. His left leg had been broken. This was a spiral fracture of the tibia, which indicated "that at the moment the bone was breaking, the leg was being twisted . . . ."

Human bite marks were found on Joey's pubis and scrotum, his right arm, and both of his feet. Based on dental molds taken from both defendants, Dr. Gregory Golden, a forensic dentist, testified the usable bite marks and Culuko's teeth "had very consistent points of matching characteristics."

There was subdural bleeding around the brain. This indicated "violent shaking . . . combined with an impact to the head . . . ." It could not have been caused by a fall off a bed.

Dr. Sheridan was able to approximate the age of the injuries based on inflammation, which would begin six to eight hours after injury, and hemosiderin, which would appear several days after injury. Most of the injuries showed no inflammation, indicating they were inflicted "very shortly before death"—most likely at the same time as the fatal blow. The rib fractures, the bite mark on the right arm, and one set of forehead bruises showed slight inflammation, indicating they were "recent," meaning a few hours to a few days old. The broken leg and one of the bite marks on the right foot were the oldest injuries. Even so, they showed no hemosiderin, indicating they were not more than five days old.

Room 210 of the Early California Motel was rented to Garcia. In a search of the room, the police found both male and female clothes in the dresser.

There was a makeshift baby bed on the floor; on the blankets of the baby bed, there were human bloodstains.

### C. Defendants' Statements to Police.

#### 1. Culuko's Statements.

While Culuko was still at Loma Linda, a police officer interviewed her. She told him she had been staying in room 210 of the Early California Motel in Riverside. On Wednesday, January 24, 1996, around 9:00 a.m., she was changing the baby's diaper when he fell off the bed. He cried briefly, but seemed fine. About 9:00 p.m. on Thursday, January 25, however, he seemed to be sick. He was up most of the night. That morning, she took him to the clinic. She was changing his diaper when she noticed he was not breathing. She said Garcia was her boyfriend. She denied that he lived in the motel room.

Defendants were taken to the police station and interviewed separately. Culuko said she and Garcia were the only people who had been around the baby in the week before he died. From Tuesday through Thursday, Garcia had been home sick.[2] On Wednesday, the baby had fallen off the bed. On Thursday, the baby started coughing and whimpering and would not eat much. On Friday morning, after Garcia had already left for work, the baby refused to eat and appeared dehydrated. Around 7:30 a.m., she called Garcia at work;[3] he came back and drove them to the clinic.

Culuko went to check in. At that point, Garcia was holding the baby. When she got back to the car, the baby was in the passenger seat. When she picked him up, "He started going flimsy on me." She changed his diaper, then realized he was not breathing.

Culuko admitted using methamphetamine "infrequent[ly]." Her face was bruised; she explained the bruise as a "hick[ey]."

#### 2. Garcia's Statement.

Garcia told police he had been home sick for two days during the previous week; he made inconsistent statements as to which days they were and as to when he had gone to see a doctor. When asked how the baby had gotten

---

[2]According to Garcia's time card, he was off sick on Tuesday and Wednesday, January 23 and 24.

[3]The making of this call was also shown by the testimony of Garcia's father—who doubled as his employer—as well as a telephone bill.

bruised, he said that on Wednesday, around 9:00 a.m., the baby had fallen off a bed. On Wednesday or Thursday night, while giving the baby a bath, Garcia had noticed bruises on his face and scratches on his feet.

On January 26, at 2:30 a.m., Garcia awoke. The baby was also awake, moving and "talking" but not crying. He gave the baby a bottle. At 6:00 a.m., when he got up, the baby was awake and seemed normal. At 6:10 a.m., he left for work. His work hours were 7:00 a.m. to 3:30 p.m.

Around 7:30 a.m., Culuko called him at work. She said the baby was sick; she asked him to come back and take them to the clinic. As he drove them there, the baby made "a wheezing sound," but seemed fine otherwise.

Garcia gave two different accounts of events at the clinic. At first, he said the baby never got out of the car seat; Culuko opened the back door, then saw he was not breathing. When confronted with Culuko's version, however, he admitted he had held the baby and put him in the passenger seat, and Culuko had changed his diaper.

Garcia insisted that he never took care of the baby. He was never alone with the baby for more than 10 or 15 minutes. He admitted using methamphetamine with Culuko "a couple of times."

D. *Testimony About Defendants' Relationship.*

On or about December 1, 1995, Culuko and Garcia met and began living together. At first, they moved in with Sandra Hinz and Hinz's then boyfriend. They all used drugs, every day. Hinz had seen Culuko lose her temper with the baby and drop him onto a bed or couch. Culuko showed Hinz bruises on the baby's arms and legs and said, "I don't know where they came from." Hinz responded, "[O]bviously they're being brought to him. He can't hurt himself . . . ." A few days later, Culuko said she had found out that the baby was pinching himself. Garcia was usually at work during the day. Although he had "a lot more patience," Hinz had seen him lose his temper and curse at the baby. He also frequently got upset with Culuko for not taking care of the baby.

Around Christmas of 1995, defendants moved in with James Strawn. All three used methamphetamine daily. Generally, Garcia went out to work while Culuko slept all day. Sometimes, Culuko would be sleeping while the baby was crying; Strawn would either wake her up or take care of the baby himself. Garcia took care of the baby, but he "bitched about it." Several times, when Garcia was alone with the baby, Strawn heard a slap or "a

thump up against the wall," and then the baby crying. Once, when Strawn asked what had happened, Garcia said, "[N]othing"; another time, he said the baby had fallen off the bed.

Tanja Starns lived next door to Strawn. When defendants were living with Strawn, she visited them often. Once or twice, she used methamphetamine with them. Because there was a hole in the common wall between them, Starns could hear what was going on in their apartment. Culuko slept a lot during the day. If the baby cried while Culuko was asleep, Garcia got "frustrated" with the baby and angry with Culuko. She also heard Culuko yell at the baby. She heard both Culuko and the baby being slapped. Once, Starns saw bruises on the baby's forehead. Culuko explained that the baby had rolled off a chest they were using as a table.

Angelic Starns, Tanja Starns's nine-year-old daughter, played with the baby every day. She saw bruises on his arm and leg. She saw both Culuko and Garcia spank the baby's bottom—Garcia because he was "getting into stuff" or "crying." She also saw Culuko and Garcia hitting each other.

Darla Roberts had known Culuko for nine years. She thought of Culuko as her daughter; Culuko called her "mommy." Roberts often baby-sat Joey. Roberts never saw Culuko hit the baby. However, she did see Garcia regularly flick his finger or swat his hand against the baby's head or chest. Once, she saw Garcia slap Culuko in the face. In November 1995, "[b]ecause things weren't going on right with the baby," Roberts began keeping a journal. In December 1995, Roberts called child protective services about the way the baby was being treated, but she was told they were overworked and understaffed.

On January 9, 1996, Roberts noticed a bruise the size of a baseball on the baby's bottom and a scratch on his thigh. Both defendants said he had pinched himself. On January 13, 1996, the baby's right ear was bruised, both outside and inside the ear canal, and there was a knot on his forehead. Garcia said he had fallen off the bed again.

On January 15, 1996, defendants went to stay with Garcia's sister, Tracy Garcia-Todd. Although Garcia-Todd changed the baby, she denied seeing any bruises on him. Once, she heard the baby crying; she found him on the floor, wedged between a pillow and a bed. Culuko was asleep on the floor next to him. Garcia-Todd tried to wake her up, but could not.

On January 20, 1996, Culuko and Garcia moved into the motel. On January 21, 1996, they left the baby with Roberts overnight. He had no fresh

bruises. Garcia said he was not letting Culuko touch the baby; he wanted full responsibility for caring for the baby, so the baby would bond with him. Culuko confirmed this.

On January 25, 1996, about 3:00 p.m., Roberts spoke to Culuko on the phone. She could hear the baby crying. Culuko said the baby had a cold; she also said he had fallen off the bed again, but seemed okay. Roberts told her to take him to a doctor. Garcia came on the phone; he said, "[I]f you care so much then you take the baby yourself," because Culuko had to cook his dinner, then hung up.

### E. *The Tape of Defendants' Conversation at the Police Station.*

The police left defendants alone together in an interview room and videotaped their ensuing conversation. In it, they agreed that one of them had to be guilty; they each denied responsibility, yet also refused to blame the other:

"CULUKO: [I]f it isn't you, it's me, if it's not me, it's you.

"GARCIA: True. Is that not true?

"CULUKO: In other words, it's pointing on both of us.

"GARCIA: Yeah, and I never did it.

"CULUKO: Neither did I."

Later, Garcia said: "I don't know why, I don't know how to explain . . . beat to death. [¶] I only punched his heart like that." Culuko responded, "I didn't tell them that."

Defendants also said:

"CULUKO: And you promised me that my son would be all right. That nothing would go down until we find out what happened. . . . [Y]ou promised me you were going to keep it this time.

"GARCIA: Karen, what promise did I break?

"CULUKO: That's the only one.

"GARCIA: What?

"CULUKO: That he would be alive."

F. *Defendants' Correspondence.*

In February 1996, Culuko wrote to Garcia, "I explained the teeth impressions to you, so I don't have to say no more, right? Right. Drop that subject and try very hard not to repeat any of this case in the letters, okay? Thank you. It's better for both of us."

In March 1996, she wrote, "[I]f you want to know what I do, then you better tell me what you know. If I wanted to hurt you, I would, and you know how I could do that, don't you? I don't think I have to remind you, but if I do, let me know." She also wrote: "Tell the truth . . . . That is what I am doing, and telling what I know, which is *Nothing*, if you get what I am saying." Finally, she wrote: "Lord Jesus, I realize I am a lost, guilty, hell-deserving sinner."

G. *Defense Expert Testimony.*

Garcia called Dr. Barry Silverman, an expert pathologist. He agreed that the cause of death was a ruptured artery. He believed, however, that death had occurred at approximately 7:30 a.m., and the fatal injury had occurred less than an hour before death. The bruises and bite marks had been inflicted two hours, at most, before death. He agreed with Dr. Sheridan that the broken leg was the oldest injury, inflicted "[s]everal days" before death.

Culuko called Dr. Jon Rowland, an expert pediatric pathologist. He agreed that rigor mortis had probably already begun before the baby arrived at the clinic. Based on the appearance of rigor mortis in the arms and legs by 9:40 a.m., he testified the time of death was between 3:00 and 5:00 a.m. The artery had to have ruptured "very shortly before death."

II

LIABILITY FOR MURDER WITHOUT MALICE

■ Defendants contend the jury instructions erroneously permitted them to be found guilty of murder without malice.

The jury was instructed on the natural and probable consequences doctrine, as follows:

"One who aids and abets another in the commission of a crime i[s] not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted.

"In order to find a defendant guilty of the crime of murder . . . based upon aiding and abetting, you must be satisfied beyond a reasonable doubt that:

"1) The crime of felony child endangerment was committed,

"2) The defendant aided and abetted the crime of felony child endangerment,

"3) A [c]o-[p]rincipal in the crime of felony child endangerment committed the crime of murder . . . and,

"4) The crime of murder was a natural and probable consequence of the commission of the crime of felony child endangerment.

"In determining whether the crime of murder was a natural and probable consequence, you must determine whether a reasonable person in the [d]efendant's position would have known that the crime was a reasonable foreseeable consequence of the act aided and abetted. In making this determination, you must consider those circumstances which the defendant knew, taking into account all the facts and circumstances surrounding the particular defendant[']s conduct."

The jury was also given the following special instruction, which defendants call the " 'either/or' instruction":

"Those who aid and abet a crime and those who directly perpetrate the crime are principals and equally guilty of the commission of that crime. You need not unanimously agree, nor individually determine, whether a defendant is an aider and abettor or a direct perpetrator.

"The individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other."

Defendants note that, under the second degree felony-murder rule, a defendant can be found guilty of murder, even in the absence of malice, if he or she committed the homicide in the perpetration of an inherently dangerous felony. (See *People v. Hansen* (1994) 9 Cal.4th 300, 308 [36 Cal.Rptr.2d 609, 885 P.2d 1022]; *People v. James* (1998) 62 Cal.App.4th 244, 257-258 [74 Cal.Rptr.2d 7].) Defendants also note that felony child abuse is not an inherently dangerous felony for this purpose. (See *People v. Lee* (1991) 234

Cal.App.3d 1214, 1220-1229 [286 Cal.Rptr. 117]; *People v. Caffero* (1989) 207 Cal.App.3d 678, 682-684 [255 Cal.Rptr. 22].) Defendants apparently argue the *only* way they could be found guilty of murder, absent malice, is under the felony-murder rule.

This is not the law. Under the natural and probable consequences doctrine, " ' ". . . the aider and abettor in a proper case is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable consequences of any act that he knowingly aided or encouraged." ' " (*People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392], italics omitted, quoting *People v. Durham* (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198], cert. den. 395 U.S. 968 [89 S.Ct. 2116, 23 L.Ed.2d 755], quoting *People v. Villa* (1957) 156 Cal.App.2d 128, 134 [318 P.2d 828].)

The natural and probable consequences doctrine operates independently of the second degree felony-murder rule. It allows an aider and abettor to be convicted of murder, without malice, even where the target offense is not an inherently dangerous felony. (See, e.g., *People v. Lucas* (1997) 55 Cal.App.4th 721, 732-733 [64 Cal.Rptr.2d 282] [target offense of brandishing a firearm]; *People v. Laster* (1997) 52 Cal.App.4th 1450, 1463-1466 [61 Cal.Rptr.2d 680] [target offense of discharging a firearm from a motor vehicle].)

Indeed, defendants eventually concede that: "[W]here two or more defendants have committed an unlawful act in which a death has resulted, and the state has proven that one of the defendants actually harbored the malice necessary for a murder conviction (either express or implied), it may be appropriate to rely on the natural and probable consequence doctrine to hold the other defendants liable." (Emphasis omitted.) We agree. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1123 [77 Cal.Rptr.2d 428, 959 P.2d 735] [to find perpetrator guilty of murder, jury had to find he acted with malice; to find aider and abettor guilty of murder, jury had to find he knowingly and intentionally aided and abetted target offense, and murder was natural and probable consequence].)

Defendants therefore argue that, here, the jury was not required to find that either defendant harbored malice. ■ The Supreme Court has repeatedly rejected the contention that an instruction on the natural and probable consequences doctrine is erroneous because it permits an aider and abettor to be found guilty of murder without malice. (*People v. Garrison* (1989) 47 Cal.3d 746, 777-778 [254 Cal.Rptr. 257, 765 P.2d 419]; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1231-1232 [249 Cal.Rptr. 71, 756 P.2d 795].) "The

mens rea of an accomplice is 'not designed to ensure that his conduct constitutes the offense with which he is charged. His liability is vicarious. . . . [Citation.]' [Citation.] 'It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which . . . must be found by the jury.' [Citation.]" (*Garrison, supra*, at p. 778, quoting *People v. Croy, supra*, 41 Cal.3d at p. 12, fn. 5.)

Defendants point to the "either/or" instruction. Despite this instruction, however, the jury *did* have to find that some defendant harbored malice. The obvious candidate was the one who delivered a piledriver blow to Joey's stomach. The jury simply did not have to find whether that defendant was Garcia or Culuko.

The "either/or" instruction was a correct statement of law. It derived from cases holding the jury need not agree unanimously on whether the defendant was the perpetrator or the aider and abettor, and, accordingly, the trial court need not instruct the jury to agree unanimously on this. (*People v. Majors* (1998) 18 Cal.4th 385, 407-408 [75 Cal.Rptr.2d 684, 956 P.2d 1137], cert. den. (1999) 526 U.S. 1007 [119 S.Ct. 1148, 143 L.Ed.2d 214]; *People v. Beardslee* (1991) 53 Cal.3d 68, 92-94 [279 Cal.Rptr. 276, 806 P.2d 1311], cert. den. 502 U.S. 972 [112 S.Ct. 449, 116 L.Ed.2d 467]; *People v. Hernandez* (1995) 34 Cal.App.4th 73, 77-80 [40 Cal.Rptr.2d 223]; *People v. Gonzales* (1995) 31 Cal.App.4th 1248, 1251-1256 [37 Cal.Rptr.2d 537]; *People v. Perez* (1993) 21 Cal.App.4th 214, 217-223 [26 Cal.Rptr.2d 691]; *People v. Snead* (1993) 20 Cal.App.4th 1088, 1095-1096 [24 Cal.Rptr.2d 922]; *People v. Phan* (1993) 14 Cal.App.4th 1453, 1464-1465 [18 Cal.Rptr.2d 364]; *People v. Davis* (1992) 8 Cal.App.4th 28, 32-45 [10 Cal.Rptr.2d 381]; *People v. Forbes* (1985) 175 Cal.App.3d 807, 816-817 [221 Cal.Rptr. 275].)

Here there are two slight twists. First, defendants are not arguing the trial court failed to give a unanimity instruction; they are arguing it erred by *affirmatively* instructing the jurors that they did *not* have to agree unanimously. As it has been held that there is no applicable unanimity requirement, however, we cannot see how the trial court erred by telling the jury so.

Second, the instruction stated that *each individual juror* did not have to decide whether any given defendant was the perpetrator or the aider and abettor. This particular aspect of the instruction was nearly a direct quote from *People v. Santamaria* (1994) 8 Cal.4th 903, 919 [35 Cal.Rptr.2d 624, 884 P.2d 81], in which the Supreme Court said: "Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of

guilt. Sometimes, as probably occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other." (*Id.*, at p. 919.) The court concluded it would be "absurd . . . to let the defendant go free because each individual juror had a reasonable doubt as to his exact role." (*Id.*, at p. 920, fn. 8; accord, *People v. Garrison, supra*, 47 Cal.3d at pp. 781-782.)

We therefore hold the instructions quoted above did not permit the jury to find defendants guilty of murder without the necessary finding of malice.

## III

### APPLICATION OF THE MERGER DOCTRINE*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV

### THE APPLICATION OF THE NATURAL AND PROBABLE CONSEQUENCES DOCTRINE TO AN "ACT" AS OPPOSED TO A "CRIME"

 Defendants contend the instructions erroneously allowed the jury to apply the natural and probable consequences doctrine to the "crime" of felony child abuse rather than to any particular "act" of felony child abuse.

The Supreme Court has not clearly specified whether the natural and probable consequences doctrine looks to the consequences of an "act" or a "crime." In earlier cases, the court stated the doctrine in terms of an "act." For example, in *People v. Durham*, it said: " '[T]he aider and abettor in a proper case is . . . also liable for the natural and reasonable or probable consequences of any *act* that he knowingly aided or encouraged.' " (*People v. Durham, supra*, 70 Cal.2d at p. 181, italics added by *Durham* omitted, new italics added; accord, *People v. Croy, supra*, 41 Cal.3d at p. 12, fn. 5.) Similarly, in *People v. Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318], it said: "The liability of an aider and abettor extends also to the natural and reasonable consequences of the *acts* he knowingly and intentionally aids and encourages." (*Id.*, at p. 560, italics added.)

More recently, however, the court has stated the natural and probable consequences doctrine in terms of a "crime" or "offense." In *People v.*

---

*See footnote, *ante*, page 307.

*Prettyman* (1996) 14 Cal.4th 248 [58 Cal.Rptr.2d 827, 926 P.2d 1013], it said: "[A] person who aids and abets a confederate in the commission of a criminal act is liable . . . for any other offense (nontarget crime) committed by the confederate as a 'natural and probable consequence' of the *crime* originally aided and abetted." (*Id.*, at p. 254, italics added.) Likewise, in *People v. Mendoza*, it said: "[T]he aider and abettor is guilty . . . of any other crime the direct perpetrator actually commits that is a natural and probable consequence of the target *offense.*" (*People v. Mendoza, supra,* 18 Cal.4th at p. 1123, italics added.)

On a few occasions, the court has spoken out of both sides of its mouth. (*People v. Williams* (1997) 16 Cal.4th 635, 679, fn. 16 [66 Cal.Rptr.2d 573, 941 P.2d 752], cert. den. (1998) 523 U.S. 1027 [118 S.Ct. 1314, 140 L.Ed.2d 478] [". . . the four murders were the natural and probable consequence of criminal *acts (assault with a deadly weapon or shooting at an inhabited dwelling)* that defendant knowingly aided and abetted" (italics added)]; *People v. Bunyard, supra,* 45 Cal.3d at pp. 1231 [" '[t]he liability of an aider and abettor extends also to the natural and reasonable consequences of the *acts* he knowingly and intentionally aids and encourages' " (italics added)], 1232 [murder of fetus "was a reasonably foreseeable and, indeed, inevitable [consequence of the] *offense* of the first degree murder" of mother (italics added)].)

The Supreme Court's waffling on this point is no doubt due to the fact that, in most cases, the fine sophistic distinction between an "act" and a "crime" is irrelevant. Felony child abuse, however, has been held to be a continuous course of conduct crime. (*People v. Vargas* (1988) 204 Cal.App.3d 1455, 1460-1464 [251 Cal.Rptr. 904]; *People v. Sheffield* (1985) 168 Cal.App.3d 158, 167 [214 Cal.Rptr. 40]; *People v. Ewing* (1977) 72 Cal.App.3d 714, 717 [140 Cal.Rptr. 299].) ▪ A continuous course of conduct crime is one in which the actus reus is defined as a series of acts over a period of time. (*People v. Whitham* (1995) 38 Cal.App.4th 1282, 1295 [45 Cal.Rptr.2d 571]; *People v. Jenkins* (1994) 29 Cal.App.4th 287, 300 [34 Cal.Rptr.2d 483].) Typical continuous course of conduct crimes include misdemeanor child annoyance, pimping, pandering, failure to provide for a minor child, contributing to the delinquency of a minor, and dissuading a witness from testifying. (*People v. Gear* (1993) 19 Cal.App.4th 86, 92 [23 Cal.Rptr.2d 261], cert. den. (1994) 511 U.S. 1088 [114 S.Ct. 1846, 128 L.Ed.2d 471], and cases cited.) The primary significance of defining a crime as a continuous course of conduct is that the jury need not agree unanimously that the defendant committed any particular act or acts; it need only agree unanimously that he or she engaged in the prohibited conduct. (*People v. Adames* (1997) 54 Cal.App.4th 198, 206-208 [62 Cal.Rptr.2d 631]; *People v. Whitham, supra,* 38 Cal.App.4th at pp. 1294-1297.)

Here, there was evidence of a number of discrete acts, any one of which the jurors could have found to constitute felony child abuse.[4] These included the twisting and breaking of Joey's leg, the fracturing of his ribs, the punch to his face, and the violent shaking, in addition to the final, fatal punch. Also, it is at least arguable that the jurors could have found felony child abuse based on the bruises on Joey's arms and legs, bottom, and forehead (i.e., the one Tanja Starns saw, plus the ones found at the autopsy), the bruise on his ear, and/or the bite marks.[5] Finally, as to Culuko, the jurors could have found felony child abuse based on her merely leaving Joey in Garcia's dubious care.

Defendants therefore argue the trial court should have instructed that the natural and probable consequences doctrine applies to an "act." In essence, in defendants' view, the jurors should have been required to: (1) identify each particular act of felony child abuse; (2) determine whether the defendant who did not perpetrate that act of felony child abuse did aid and abet it; and, if so, (3) determine whether murder was the natural and probable consequence of that act of felony child abuse.

Instead, the jurors were instructed to determine whether "[t]he crime of murder was a natural and probable consequence of the commission of the *crime* of felony child endangerment." (Italics added.) According to defendants, this opened the door to a legally incorrect conviction; for example, it permitted the jurors to reason that: (1) Culuko aided and abetted *some* act of felony child abuse by Garcia; (2) murder was the natural and probable consequence of some *other* act of felony child abuse by Garcia; and hence, (3) Culuko was guilty of murder.

Defendants' instructional model suggests the aider and abettor must intend to facilitate the specific "act" by which the perpetrator ultimately commits the intended crime. This is clearly not the law. " 'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the *crime*, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the *crime*.'

---

[4]Felony child abuse is committed by: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, [1] willfully [a] causes or permits any child to suffer, or [b] inflicts thereon unjustifiable physical pain or mental suffering, or [2] having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or [3] willfully causes or permits that child to be placed in a situation where his or her person or health is endangered . . . ." (Pen. Code, § 273a, subd. (a).)

[5]On the other hand, it is likewise arguable that, as to these comparatively minor injuries, there was insufficient evidence of "circumstances or conditions likely to produce great bodily harm or death . . . ." (Pen. Code, § 273a, subd. (a).)

[Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 851 [72 Cal.Rptr.2d 656, 952 P.2d 673], italics added, quoting *People v. Cooper* (1991) 53 Cal.3d 1158, 1164 [282 Cal.Rptr. 450, 811 P.2d 742].)

If, however, the perpetrator ultimately commits some different or additional crime, the natural and probable consequences doctrine is triggered. ■ "[T]he test of natural and probable consequences is an objective one. [Citation.] '[T]he issue does not turn on the defendant's subjective state of mind, but depends upon whether, under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant.' [Citation.]" (*People v. Smith* (1997) 57 Cal.App.4th 1470, 1480 [67 Cal.Rptr.2d 604], quoting *People v. Nguyen* (1993) 21 Cal.App.4th 518, 531 [26 Cal.Rptr.2d 323].) Thus, in applying the natural and probable consequences doctrine, the jury must consider the aider and abettor's actual circumstances. The aider and abettor may intend or expect the perpetrator to commit the crime in the form of a single, well-defined criminal "act." On the other hand, the aider and abettor may have only the vaguest idea of the precise "act" by which the perpetrator will commit the crime.

■ In *People v. Prettyman*, the Supreme Court held that instructions identifying the target crime will help the jury with this analysis: "[I]dentification of the target crime will facilitate the jury's task of determining whether the charged crime allegedly committed by the aider and abettor's confederate was indeed a natural and probable consequence of any uncharged target crime that, the prosecution contends, the defendant knowingly and intentionally aided and abetted. The facts of this case illustrate this point. If . . . the jury had concluded that defendant Bray had encouraged codefendant Prettyman to commit an assault on Van Camp but that Bray had no reason to believe that Prettyman would use a deadly weapon such as a steel pipe to commit the assault, then the jury could not properly find that the murder of Van Camp was a natural and probable consequence of the assault encouraged by Bray. [Citation.] If, on the other hand, the jury had concluded that Bray encouraged Prettyman to assault Van Camp with the steel pipe, or by means of force likely to produce great bodily injury, then it could appropriately find that Prettyman's murder of Van Camp was a natural and probable consequence of that assault. Therefore, instructions identifying and describing the crime of assault with a deadly weapon or by means of force likely to produce great bodily injury . . . as the appropriate target crime would have assisted the jury in determining whether Bray was guilty of Van Camp's murder under the 'natural and probable consequences' doctrine." (*People v. Prettyman, supra,* 14 Cal.4th at p. 267.)

In our view, merely instructing the jury to determine whether murder was the natural and probable consequence of the "act" aided and abetted could hurt more than it helps. The jury could take this too broadly, as meaning the "act" the perpetrator actually performed—in the Supreme Court's example, assault with a steel pipe—even if the aider and abettor could not reasonably foresee it. Contrariwise, the jury could also take it too narrowly, as limiting it to some "act" that the aider and abettor actually intended. Thus, if it found the aider and abettor intended to facilitate an assault with a knife, but the perpetrator actually committed an assault with a steel pipe, the jury might erroneously conclude that murder was not the natural and probable consequence of the assault aided and abetted.

We believe the best way to convey the crucial legal principle is by an entirely separate instruction. Here, the trial court gave such an instruction. It explained: "In determining whether the crime of murder was a natural and probable consequence, you must determine whether a reasonable person in the [d]efendant's position would have known that the crime was a reasonable foreseeable consequence of the act aided and abetted. In making this determination, you must consider those circumstances which the defendant knew, taking into account all the facts and circumstances surrounding the particular defendant[']s conduct."

This instruction was adequate. It prevented the jurors from finding Culuko guilty of murder, merely because she aided and abetted Garcia's commission of felony child abuse, if it was unforeseeable that Garcia would commit murder as a result. At the same time, it *allowed* the jurors to find Culuko guilty of murder if she *did* aid and abet Garcia's commission of felony child abuse, and if it *was* foreseeable that Garcia would commit murder as a result. Moreover, it did not erect an artificial requirement that Culuko had to intend and encourage Garcia to deliver the fatal punch to the abdomen. It could be sufficient that she intended and encouraged Garcia to brutalize the baby any way he chose, as long as murder was a foreseeable result.

Indeed, defendants concede that, "[i]n the typical case," this instruction would be adequate to "resolve any confusion."[6] They argue, however, it was inadequate here because felony child abuse is a continuing course of conduct crime, and therefore the jurors did not have to agree unanimously on the "act" or "acts" constituting felony child abuse.

Precisely *because* unanimity was not required, however, the jury instructions were adequate. Defendants were not entitled to an instruction requiring

---

[6]Defendants conspicuously do *not* contend this instruction, referring to the consequences of an "act," was inconsistent with other instructions referring to the consequences of a "crime." We therefore do not consider any such contention.

the jurors to identify or agree on an act of felony child abuse. Defendants also were not entitled to an instruction requiring the jurors to agree on whether either of them was guilty as an aider and abettor rather than as a perpetrator; a fortiori, they were not entitled to an instruction requiring the jurors to identify or agree on an act of aiding and abetting. Defendants *were* entitled to an instruction limiting their liability for murder under the natural and probable consequences doctrine to the reasonably foreseeable consequences of an act of felony child abuse which they aided and abetted. Such an instruction was given. We reject defendants' claim of error.

V

## The Liability of a Perpetrator Under the Natural and Probable Consequences Doctrine

■ At our request, the parties submitted supplemental letter briefs addressing the question of whether each defendant was a perpetrator of felony child abuse, rather than an aider and abettor, so that the natural and probable consequences doctrine did not apply. Understandably, defendants took the affirmative in this debate, while the People argued the negative.

We have since concluded that, even if defendants were perpetrators, they could still be liable under the natural and probable consequences doctrine. This is the teaching of *People v. Olguin* (1994) 31 Cal.App.4th 1355 [37 Cal.Rptr.2d 596]. There Olguin, Mora, and Hilario, all members of the same gang, encountered several members of a rival gang, including victim Ramirez. (*Id.*, at pp. 1366-1367.) After an initial verbal confrontation, Mora punched Ramirez in the face, knocking him down. Ramirez got up and started walking toward the defendants. Olguin then shot and killed Ramirez. (*Id.*, at p. 1367.) Both Olguin and Mora were found guilty of second degree murder. (*Id.*, at p. 1366.)

On appeal, Mora argued the natural and probable consequences doctrine did not apply to him because he was the perpetrator of the target assault on Ramirez. (*People v. Olguin, supra*, 31 Cal.App.4th at p. 1375.) The appellate court disagreed: "The flaw in Mora's reasoning is that a perpetrator of an assault and an aider and abettor are *equally* liable for the natural and foreseeable consequences of their crime. Both the perpetrator and the aider and abettor are principals, and *all* principals are liable for the natural and reasonably foreseeable consequences of their crimes. . . ." (*Id.*, at p. 1376.) "In fact, this case aptly demonstrates the folly of Mora's position. If it were adopted, Hilario, who did nothing but stand by and watch, could be convicted of murder if the jury were convinced he was there to back up his

homeboys and thereby encouraged Olguin and Mora in the assault on Ramirez. But Mora, who actually perpetrated the assault, would escape liability on the basis that he was the party who initiated the action. [¶] Fortunately, that is not the law. Mora was a principal in the assault on Ramirez and therefore responsible for the natural and probable consequences of that assault." (*Ibid.*)

Here, the jury could have found that Garcia and Culuko were both liable for felony child abuse as perpetrators. Even if so, each of them could be liable, under the natural and probable consequences doctrine, for a murder perpetrated by the other.

Although the jury was never so instructed (see pt. VI, *post*), this lacuna was entirely favorable to defendants. It precluded them from being found derivatively liable for murder based solely on their perpetration of "passive" felony child abuse, i.e., permitting suffering, injury, or danger to a child. Rather, each of them could be found derivatively liable for murder only as the aider and abettor of felony child abuse. As the jury was instructed, this required some "active" conduct. Nevertheless, the fact that each defendant could have been found guilty, as the perpetrator, of felony child abuse did not bar the operation of the natural and probable consequences doctrine.

## VI

### "ACTIVE" AIDING AND ABETTING VERSUS "PASSIVE" FELONY CHILD ABUSE

█ Defendants contend that aiding and abetting liability—particularly liability under the natural and probable consequences doctrine—requires an affirmative act, whereas felony child abuse can be committed by an omission to act. They conclude that ". . . the natural and probable consequence theory of liability . . . should have had no application to a [felony child abuse] prosecution."

█ Defendants raised this contention for the first time in response to our request for supplemental briefing. However, it does not appear to be within the scope of our request. For this reason, and because it was not raised in their opening briefs, or even in their reply briefs, this contention has been waived. (*People v. Adams* (1990) 216 Cal.App.3d 1431, 1441, fn. 2 [265 Cal.Rptr. 568].)

■ Alternatively, even if not waived, it lacks merit. We recognize that, at least ordinarily,[7] mere failure to prevent a crime falls short of aiding and abetting. (*In re Michael T.* (1978) 84 Cal.App.3d 907, 911 [149 Cal.Rptr. 87].) Aiding and abetting requires that the defendant "by act or advice, aids, promotes, encourages or instigates[] the commission of the crime." (*People v. Beeman, supra,* 35 Cal.3d at p. 561.)

Here, however, the jury was so instructed. Moreover, it was instructed that, to find a defendant guilty of murder under the natural and probable consequences doctrine, it had to find that that defendant aided and abetted the crime of felony child abuse. Thus, arguably the jury could have convicted either defendant of felony child abuse *as a principal* based solely on inaction. However, it could not have convicted him or her of felony child abuse *as an aider and abettor* based solely on inaction. It follows that it could not have convicted him or her of murder, under the natural and probable consequences doctrine, based solely on inaction.

There was ample evidence that each defendant aided and abetted felony child abuse by more than mere inaction. There was evidence that Garcia personally hit the baby, even before the fatal blow was struck. Culuko called Hinz's attention to bruises on the baby and said she did not know where they came from. The jury could reasonably conclude Garcia inflicted them. Several times, when Garcia was alone with the baby, Strawn heard a slap or a thump against the wall, followed by the baby crying. Several witnesses saw Garcia strike the baby, admittedly in harmless ways, such as spanking him or flicking his finger against his forehead or chest; witnesses also saw severe bruises on the baby. The jury could put two and two together to conclude that, when no eyewitnesses were around, Garcia struck Joey more violently.

There also was evidence that Culuko personally injured the baby by biting him. At least one of the bite marks was a few days older than the others. Both defendants repeatedly covered up for the perpetrator, explaining Joey had pinched himself or had fallen off a bed. The jury could reasonably find that, no matter which defendant perpetrated felony child abuse, the other defendant affirmatively aided and encouraged him or her to do so.

---

[7]Some state courts have held that a failure to act can constitute aiding and abetting, provided the aider and abettor has a legal duty to act. (*People v. Stanciel* (1992) 153 Ill.2d 218, 235-237 [180 Ill.Dec. 124, 606 N.E.2d 1201, 1210-1212] [mothers aided and abetted murder by failure to protect their children]; *State v. Walden* (1982) 306 N.C. 466, 471-476 [293 S.E.2d 780, 784-787] [mother aided and abetted assault with a deadly weapon by failing to protect her child]; contra, *Com. v. Raposo* (1992) 413 Mass. 182, 184-189 [595 N.E.2d 773, 775-778]; *State v. Jackson* (1999) 137 Wn.2d 712, 720-726 [976 P.2d 1229, 1232-1236].) We are not aware of any California case in which this issue has been squarely presented.

# VII

## FAILURE TO INSTRUCT ON INVOLUNTARY MANSLAUGHTER*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# VIII

## THE SUFFICIENCY OF THE EVIDENCE THAT GARCIA
## WAS GUILTY OF MURDER

 Garcia contends that there was insufficient evidence to support his conviction of second degree murder.

Obviously, there was evidence that Garcia killed Joey. Garcia had stated he was taking full responsibility for the baby and was not letting Culuko touch him. Culuko accused Garcia of breaking a promise that Joey would be alive. The jury could take Garcia's statement, "I don't know how to explain . . . beat to death. [¶] I only punched his heart like that," as an admission. In addition, as we discussed in part VI, *ante*, there was evidence he had hit Joey many times before. Finally, as we have already discussed at length in the nonpublished portion of this opinion, there was ample evidence that the person who struck the fatal blow did so with implied malice; indeed, there was no evidence to the contrary.

Alternatively, there was ample evidence that, even if Garcia did not strike the fatal blow, he was guilty of murder under the natural and probable consequences doctrine. After all, Garcia and Culuko were the only people who were with Joey during the final five days of his life. As defendants themselves acknowledged, one or the other of them had to be the killer. Also, as we have already held, the killer acted with malice.

The jury could reasonably find that the nonkiller aided and abetted felony child abuse by the killer. Even assuming Culuko, rather than Garcia, was the killer, there was evidence that Garcia struck Joey repeatedly. Culuko bit him; Garcia admitted seeing the bite marks on his feet. When a bruise the size of a baseball appeared on Joey's bottom, both defendants told the same story: he had pinched himself. Garcia explained other bruises by claiming Joey had fallen off the bed. Inferably, defendants used the baby as a punching bag, then covered up for each other.

*See footnote, *ante*, page 307.

On January 25, at 3:00 p.m., Roberts talked to Culuko on the phone. At that point, Joey had a broken leg; he may even have had broken ribs. Roberts could hear him crying. Culuko claimed he had fallen off the bed "again." Garcia must have known this was false. Nevertheless, when Roberts suggested that Culuko take the baby to a doctor, Garcia grabbed the phone, told Roberts to take the baby to a doctor herself because Culuko had to cook his dinner, and hung up. The jury could quite properly conclude that Garcia encouraged, aided, and abetted any felony child abuse perpetrated by Culuko.

Finally, there was evidence that murder was the natural and probable consequence of the felony child abuse. "The . . . question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.]" (*People v. Mendoza, supra,* 18 Cal.4th at p. 1133.) It had long been apparent that both Garcia and Culuko were, at best, callously unconcerned about Joey's well-being. Roberts had become sufficiently alarmed to call child protective services and, when that failed, to start keeping notes. During Joey's last five days, Garcia and Culuko were living alone with him in a single motel room. Joey had begun with only old bruises, but the severity of his injuries was escalating rapidly. He was in pain; he would have been crying. He was a helpless, utterly dependent seven-month-old baby. Given this evidence, the jury could reasonably conclude that defendants should each have foreseen that the other would assault the baby, with deadly force, and with conscious disregard for his life.

As we noted earlier, in part II, *ante,* the jurors did not have to decide whether Garcia or Culuko actually delivered the fatal punch. Once they found, beyond a reasonable doubt, that each defendant was either guilty of murder as the perpetrator, or else was guilty of murder under the natural and probable consequences doctrine, it could properly find both defendants guilty of murder. We conclude that there was sufficient evidence to support Garcia's second degree murder conviction.

Garcia also contends that there was insufficient evidence to support his conviction of fatal assault on a child under eight. In support of this contention, he incorporates by reference his arguments to the effect that there was insufficient evidence of murder.[8] We therefore reject this argument for the same reasons we reject his arguments regarding murder.

---

[8]He also argues there was insufficient evidence that he had care and custody of Joey. We deal with this contention in part IX, *post.*

# IX ·

## The Sufficiency of the Evidence of Care and Custody as to Garcia

Garcia contends there was insufficient evidence that he had care and custody of Joey.

Fatal assault on a child requires, among other things, that the perpetrator have "care or custody" of the child victim. (Pen. Code, § 273ab.)

Felony child abuse requires, among other things, that the perpetrator "willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered . . . ." (Pen. Code, § 273a, subd. (a).)

Garcia contends that, under the latter statute, liability for inaction cannot be imposed absent evidence of some legal duty to take positive action. (See *People v. Heitzman* (1994) 9 Cal.4th 189, 209-214 [37 Cal.Rptr.2d 236, 886 P.2d 1229] [defendant cannot be guilty of elder abuse under Pen. Code, § 368, subd. (a), based on failure to prevent abuse, unless defendant had either care and custody of victim or duty to control conduct of perpetrator].) We question Garcia's assumption that his felony child abuse conviction was necessarily predicated on his inaction. However, if we were to sustain this conviction based on the evidence that Garcia directly inflicted felony child abuse, we would still have to reach his "care and custody" contention for purposes of his conviction for fatal assault on a child. Accordingly, we accept his assumption for the sake of argument.

We reject, however, Garcia's apparent assumption that he had to be convicted of either crime as a perpetrator. The jury was essentially instructed that he could also be convicted as an aider and abettor. Although fatal assault on a child requires that the perpetrator have care and custody of the child, it does not so require as to an aider and abettor. (*People v. Fraize* (1995) 36 Cal.App.4th 1722, 1725 [43 Cal.Rptr.2d 64] ["[U]nder an aiding and abetting theory . . . a defendant can properly be convicted of a crime even though by statutory definition the defendant would be incapable of committing the substantive offense by himself."].) Likewise, even assuming felony child abuse required in this case that the perpetrator have care and custody, there is no such requirement as to an aider and abettor. Thus, even assuming

there was no evidence that Garcia had care and custody of Joey, his conviction of both offenses would stand.

We also reject Garcia's contention for a separate and alternative reason: There *was* sufficient evidence that he had care and custody of Joey. "[There is] no special meaning to the terms 'care and custody' beyond the plain meaning of the terms themselves. The terms 'care or custody' do not imply a familial relationship but only a willingness to assume duties correspondent to the role of a caregiver." (*People v. Cochran* (1998) 62 Cal.App.4th 826, 832 [73 Cal.Rptr.2d 257].) Here, Garcia and Culuko were living together as husband and wife, in one room, with a baby. Strawn testified that Garcia took care of the baby; at times, Garcia was left alone with the baby. When interviewed by police, Garcia admitted he bathed the baby, changed the baby, and gave the baby a bottle at 2:30 a.m. Finally, and most significantly, Roberts testified that, five days before Joey died, Garcia said he was taking full responsibility for caring for the baby so the baby would bond with him. The jury did not have to believe Garcia's protestations that he never had anything to do with the baby. To the contrary, it could take this obviously false claim as additional evidence that, as Garcia well knew, he had care and custody of Joey.

## X

### MULTIPLE PUNISHMENT IN VIOLATION OF PENAL CODE SECTION 654*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## XI

### DISPOSITION

The judgment is affirmed.

Gaut, J., concurred.

**McKINSTER, Acting P. J.**—I respectfully dissent.

I disagree with nearly every aspect, published and unpublished, of the majority opinion. However, I will not elaborate on each of the many ways in which I disagree with the majority. In my view, the approach the majority

---

*See footnote, *ante*, page 307.

sanctions in this case absolved the prosecution of its duty to present evidence that proves each defendant's guilt beyond a reasonable doubt. That, simply stated, is my primary disagreement and the focus of this dissent.

The facts of this case are distressing, to say the least. José (Joey) Galindo, in his short and tragic life, was unquestionably subjected to severe physical abuse and ultimately died as a result of that abuse. The fact of the abuse is clear and undisputed. What is not clear is who was responsible, either directly or indirectly, for Joey's injuries and ultimately for his death. Because the prosecutor could not prove which defendant inflicted the injury that killed Joey or the circumstances under which that injury was inflicted, the prosecutor relied on the theory that one defendant must have punched Joey and, therefore, was guilty as the actual perpetrator of second degree murder, and that the other defendant was an aider and abettor in the target crime of felony child endangerment, of which murder was the natural and probable consequence. Although I have serious doubts about the validity of the theory, I will not discuss those concerns. Even if correct, I part company with the majority in their application of that theory to the facts of this case, for reasons I now explain.

1.

### THE PROSECUTION'S THEORY

In an effort to prove both defendants guilty of murder, the prosecutor relied on the so-called natural and probable consequences theory of criminal responsibility which makes an aider and abettor in a target crime criminally responsible for an unintended crime committed by a coparticipant if the unintended crime is the natural and probable consequence of the originally agreed-upon target crime. As the Supreme Court explained in *People v. Prettyman* (1996) 14 Cal.4th 248 [58 Cal.Rptr.2d 827, 926 P.2d 1013], a person who encourages or facilitates the commission of a crime is criminally responsible for that crime and "any other offense that was a 'natural and probable consequence' of the crime aided and abetted." (*Id.* at p. 260.) "To convict a defendant of a nontarget crime as an accomplice under the 'natural and probable consequences' doctrine, the jury must find that, with knowledge of the perpetrator's unlawful purpose, and with the intent of committing, encouraging, or facilitating [i.e., aiding and abetting] the commission of the target crime, the defendant aided, promoted, encouraged, or instigated the commission of the target crime. The jury must also find that the defendant's confederate committed an offense other than the target crime, and that the nontarget offense perpetrated by the confederate was a 'natural

and probable consequence' of the target crime that the defendant assisted or encouraged." (*People v. Prettyman, supra,* at p. 254.)

The prosecutor's theory in this case was that both defendants engaged in a several-day course of conduct during which they each, individually and/or jointly, inflicted serious bodily injury on Joey and thereby each committed felony child endangerment.[1] Because both defendants allegedly abused Joey, the prosecutor asserted they were aiders and abettors of each other in committing felony child endangerment. According to the prosecutor's approach, as aiders and abettors in the target crime of felony child endangerment, defendants each were guilty of murder under the natural and probable consequences theory if one defendant, acting with express or implied malice, punched Joey and thereby committed second degree murder, and the other defendant aided and abetted in the target crime of felony child endangerment of which murder was a natural and probable consequence.

## 2.

### THE JURY INSTRUCTIONS

In accordance with the above noted theory, and at the prosecutor's request, the trial court instructed the jury, "In order to find a defendant guilty of the crime of murder as charged under Count I based upon aiding and abetting, you must be satisfied beyond a reasonable doubt that: [¶] 1) [t]he crime of felony child endangerment was committed, [¶] 2) [t]he defendant aided and abetted the crime of felony child endangerment, [¶] 3) [a] [c]o-[p]rincipal in the crime of felony child endangerment committed the crime of murder as charged under Count I, and, [¶] 4) [t]he crime of murder was a natural and probable consequence of the commission of the crime of felony child endangerment." According to the theory of felony child endangerment relied on in the trial court, and as the trial court instructed the jury, a person who has care or custody of a child, who, "under circumstances or conditions likely to produce great bodily harm or death . . . willfully causes or, as a result of criminal negligence, permits the child to be placed in a situation that endangers the child's person or health" is guilty of felony child endangerment.

In addition to instructing the jury on the natural and probable consequences theory of criminal liability based on aiding and abetting in felony child endangerment, the trial court also instructed the jury, according to the

---

[1]The information alleged defendants committed felony child endangerment from on or about January 15, 1996, through and including January 26, 1996.

prosecutor's special instruction, that the jury "need not unanimously agree, nor individually determine, whether a defendant is an aider and abettor or a direct perpetrator. [¶] The individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other."

These instructions, if correct statements of law, were incorrect as applied to the facts in this case and had the effect of allowing the jury to convict both defendants of murder without first deciding that either defendant committed that crime, and without agreeing that defendants aided and abetted each other in either committing felony child endangerment or in committing the act that caused Joey's death—the blow to the abdomen. The defect is demonstrated by a review of the pertinent evidence.

3.

### The Evidence

The evidence showed more than one act of felony child endangerment—someone bit Joey, someone broke his leg, someone caused his severe bruises, someone broke his ribs, someone violently shook him and someone inflicted a severe blow to his abdomen that ultimately killed him. The pathologist testified that with the exception of the broken leg, most of Joey's injuries occurred very shortly before the infant died and most likely were inflicted at the same time as the fatal blow. From that testimony, a jury could infer that whoever shook Joey also inflicted the fatal injury.

There is no direct evidence to show who inflicted each of the above noted injuries. Therefore, the validity of the prosecutor's theory depends on the sufficiency of the circumstantial evidence to show that defendants aided and abetted each other in committing felony child abuse of which Joey's murder was a natural and probable consequence. Absent such evidence, the prosecutor's theory, regardless of its questionable legal correctness, must fail.

"Circumstantial evidence is evidence that, if found to be true, proves a fact from which an inference of the existence of another fact may be drawn. An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence." (CALJIC No. 2.00 (6th ed. 1996).)

With respect to the bite marks on Joey's foot and arm, the evidence shows that those marks appeared to match defendant Karen Lois Culuko's bite

pattern. From that evidence, the jury reasonably could infer that Culuko bit Joey and thereby committed felony child endangerment. In order to hold defendant Leslie Eugene Garcia liable as an aider and abettor in Culuko's act of biting Joey the evidence had to show, as the trial court instructed the jury, that he aided, promoted, encouraged or instigated Culuko's conduct. There was no evidence, direct or circumstantial, presented at trial regarding Garcia's involvement in Culuko's infliction of the bites. Consequently, a jury could not find that he aided, promoted, encouraged or instigated Culuko's act because such a finding would not have been supported by any evidence. On this state of the evidence, it is as possible that defendant Culuko bit Joey without defendant Garcia's participation or knowledge.

Absent evidence that Garcia aided and abetted Culuko's act of biting Joey, the only other basis for holding Garcia liable for felony child endangerment as a result of Culuko's act was that Garcia negligently permitted that act of endangerment to occur. As previously discussed, there was no evidence showing that defendant Garcia knew Culuko intended to injure Joey by biting him and, therefore, the evidence does not prove Garcia's liability for permitting that conduct.[2]

Apart from statutory liability for felony child endangerment based on negligently permitting Joey's injuries to occur, there is no other basis for holding Garcia criminally responsible for Culuko's act of biting Joey. Thus, assuming there was evidence to support an inference that Garcia knew Culuko was injuring Joey and that he failed to protect the child from continued injury, because Garcia was not Joey's father, he had no duty to intervene apart from that imposed by the felony child endangerment statute.[3] As the author of the majority opinion recently noted, before criminal liability may be predicated on a person's failure to act, the person first must be under a legal duty to take affirmative action. (*People v. Laster* (1997) 52 Cal.App.4th 1450, 1466-1467 [61 Cal.Rptr.2d 680], quoting *People v. Heitzman* (1994) 9 Cal.4th 189, 198 [37 Cal.Rptr.2d 236, 886 P.2d 1229].) No such duty existed here.

Applying the above analysis to Joey's remaining injuries, I must reach the same conclusion—there is insufficient evidence to show that Garcia aided

---

[2]At oral argument, the Attorney General and my colleagues in the majority all asserted that each defendant "must have known" what the other was doing. That assertion epitomizes the essential defect in this case—the substitution of "they must have known" for the requirement of proof beyond a reasonable doubt. Speculation is not a substitute for proof.

[3]I agree with the majority's rejection of Garcia's separate claim that, as a matter of law, he could not be guilty of felony child endangerment because he did not have care or custody of Joey as required by the statute.

and abetted any of Culuko's actions. More particularly, assuming without actually deciding that the fact Culuko bit Joey is sufficient circumstantial evidence to support an inference that she also inflicted the other injuries,[4] there was no evidence to show that Garcia, with knowledge of Culuko's unlawful purpose and with the intent of committing, encouraging, or facilitating that purpose, aided and abetted Culuko in the commission of those acts. Thus, at best the evidence would support Culuko's conviction for the charged offenses on the theory that she was the actual perpetrator of those crimes.

The remaining question is whether there is sufficient circumstantial evidence to show that Garcia actually perpetrated the acts that caused Joey's other injuries and ultimately his death and that Culuko, in turn, aided and abetted Garcia's conduct. According to the evidence presented at trial, as recounted by the majority, witnesses saw Garcia spank Joey on the bottom, "flick" him with his finger, "swat" him in the head and on the chest and slap him, presumably in the face. This evidence supports an inference that Garcia, like Culuko, was capable of injuring Joey and therefore was also capable of inflicting the other injuries. Once again, assuming without actually deciding that such evidence is sufficient to support an inference that Garcia actually inflicted Joey's other injuries, there is no evidence that Culuko with knowledge of Garcia's purpose, and with the intent of committing, encouraging, or facilitating that purpose, aided and abetted Garcia in the commission of his acts of felony child endangerment. In short, this evidence might be sufficient to support Garcia's conviction on the charged offenses had the jury been instructed to actually and separately determine each defendant's liability.

In summary, the evidence is insufficient to show that each defendant aided and abetted the other in a continuing course of felony child abuse, of which Joey's murder was a natural and probable consequence. Any contrary conclusion, given the total absence of evidence on this point, is purely speculation.

---

[4]The only evidence that supports a finding that Culuko inflicted Joey's other injuries is the fact that she inflicted one injury—the bite. That fact supports an inference that Culuko was capable of injuring the child and thus could have inflicted the other injuries. Since the jury in this case was not called upon to assess the individual liability of each defendant, I will not determine whether such evidence is sufficient to prove, beyond a reasonable doubt, that Culuko in fact broke Joey's leg, broke his ribs, shook him or hit him in the abdomen with sufficient force to rupture abdominal arteries. In my view, that determination is one that a properly instructed jury should make and is why the convictions in this case cannot stand.

## 4.

## THE ERROR

The above analysis reveals the defect in the majority's resolution of the issues in this case. The evidence was insufficient to establish that defendants aided and abetted each other, either actively or passively, in the individual acts of alleged felony child endangerment. Therefore, the evidence could not establish that they engaged in a joint course of conduct involving felony child endangerment. The evidence shows separate and distinct acts of felony child endangerment but no acts of aiding and abetting and thus no aider and abettor liability for murder under the natural and probable consequences theory. The failure of proof was not corrected or otherwise altered by describing the individual acts as a joint course of conduct. The defect, i.e., the absence of aiding and abetting evidence, persists despite the description. In short, if the acts were insufficient to establish guilt when considered individually they remain insufficient when considered collectively because, to put it bluntly, zero plus zero equals zero.

Had the trial court required the jury to unanimously agree on the specific act of felony child endangerment that constituted the basis for the natural and probable consequences theory of liability, the defect in the prosecutor's approach in this case would have been exposed early on. However, the trial court not only did not instruct on unanimity but, in fact, instructed the jury precisely the opposite in giving the prosecutor's special instruction on aiding and abetting.

That instruction, as previously noted, told the jury that they "need not unanimously agree, nor individually determine, whether a defendant is an aider and abettor or a direct perpetrator. [¶] The individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other."

The instruction is taken from *People v. Santamaria* (1994) 8 Cal.4th 903 [35 Cal.Rptr.2d 624, 884 P.2d 81], in which the Supreme Court held on appeal from a murder conviction that an acquittal on a knife-use special allegation did not collaterally estop the prosecution from retrying the defendant for murder on the theory the defendant stabbed and killed the victim. In addressing the requirement under the collateral estoppel doctrine that the previously resolved issue and the current issue be identical, the Supreme

Court noted the jury could have found the defendant guilty of murder as either an aider and abettor or the actual perpetrator. In the context of discussing that point, as well as discussing the defendant's assertion that the acquittal on the knife-use allegation necessarily meant the jury unanimously found the defendant guilty as an aider and abettor, the Supreme Court stated, "Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. Sometimes as probably occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other." (*People v. Santamaria, supra*, at p. 919.)

The majority notes that the instruction is a correct statement of law and, therefore, the jury properly was instructed on the legal principle. I am not as sanguine. Although the instruction is a correct statement of law, there is nothing in *People v. Santamaria*, or any of the cases cited by the majority, to suggest that a jury should be instructed on the above quoted principle. Assuming, however, that the principle is one about which a jury should be instructed, the instruction was erroneous in this case. The principle embodied in the prosecutor's special instruction is derived from cases that address the question of whether a unanimity instruction is necessary when the evidence supports guilt on a single criminal charge under more than one theory of criminal liability. Thus, for example, in *People v. Gonzales* (1995) 31 Cal.App.4th 1248 [37 Cal.Rptr.2d 537], cited by the prosecutor in the trial court as authority for the above quoted special instruction, the defendant was charged with first degree burglary. There was evidence that the defendant entered the burglarized residence and thus was the actual perpetrator of that crime and there also was evidence that the defendant aided and abetted his companion's entry into the residence. In rejecting the defendant's claim that such evidence required a unanimity instruction, the Sixth District held that it was not necessary for the jury to unanimously agree whether the defendant was an aider and abettor or the actual perpetrator of the burglary. (*Id.* at p. 1255.) In reaching this conclusion, the *Gonzales* court discussed various cases that have rejected the requirement of unanimity in this context, i.e., evidence showing the defendant could be guilty as an aider and abettor and also as the actual perpetrator. (*People v. Gonzales, supra*, 31 Cal.App.4th at pp. 1252-1255.)

The cases the *Gonzales* court relied on to support its conclusion all involved prosecutions for a single crime but on different theories of criminal liability. For example in *People v. Beardslee* (1991) 53 Cal.3d 68 [279 Cal.Rptr. 276, 806 P.2d 1311], the defendant was prosecuted for murder on

the theory that he was an aider and abettor or the actual perpetrator. The facts were undisputed that the defendant kidnapped the victim and personally loaded the gun that was used to inflict the fatal wound. The only factual dispute was whether the defendant or his coparticipant pulled the trigger and thereby inflicted the wound that actually killed the victim. In rejecting the defendant's claim that the jury should have been instructed that they had to unanimously agree on whether the defendant was the actual killer or an aider and abettor, the *Beardslee* court first noted that the unanimity requirement "typically applies to acts that could have been charged as separate offenses. . . . A jury may convict a defendant of first degree murder, however, without making a unanimous choice of one or more of several theories proposed by the prosecution, e.g., that the murder was deliberate and premeditated or that it was committed in the course of a felony. '[I]t is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of first degree murder as that offense is defined by the statute.' [Citations.] Pursuant to the latter rule, it was held in *People* v. *Forbes* (1985) 175 Cal.App.3d 807, 816-817 [221 Cal.Rptr. 275], that a conviction of second degree murder did not require unanimous agreement by the jurors on whether the accused was the actual perpetrator or was an aider and abettor." (*People v. Beardslee, supra,* 53 Cal.3d at p. 92.) Unanimity is required, however, " 'if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged.' [Citation.]" (*Id.* at p. 93.)

This case involves multiple alleged acts of felony child endangerment about which the jury could disagree, as previously discussed, and the instruction was incorrect for that reason alone. More significantly, however, under the natural and probable consequences theory of liability relied on in this case, whether a defendant was an aider and abettor or the actual perpetrator was not merely a theory of liability. Instead, it was an element of the crime, specifically, murder based on the natural and probable consequences of aiding and abetting in felony child endangerment and therefore the jury had to determine in this case whether a defendant was one or the other. In other words, the special instruction arguably would have been appropriate if the prosecutor were only proving the target crime of felony child endangerment based only on a single instance of such conduct. However, in order to elevate defendants' guilt on the target offense to guilt for murder under the natural and probable consequences theory, the prosecutor had to prove not only that one person aided and abetted in an act of felony child endangerment but, also, that the other person committed second degree murder as the actual perpetrator. Therefore, the defendant's status as either an aider or abettor or the actual perpetrator was an element of the offense about which the jury had to unanimously agree. By instructing the jury that

they need not "unanimously agree, or individually determine, whether a defendant is an aider and abettor or a direct perpetrator," the trial court allowed the jury to find both defendants guilty of murder without requiring them to decide that either defendant actually committed that crime.

In fact, the prosecutor made that precise argument to the jury in closing. In explaining how the jury could find murder based on the evidence that both defendants engaged in felony child endangerment, the prosecutor stated, "They encouraged it, they facilitated it. [']This is the way we treat Joey. I hit him, you hit him, we both neglect him. This is the way it is.['] [¶] Mr. Swanson [Culuko's attorney] told you during his opening that at the end of this case you would not be able to find his client guilty because I would not be able to prove to you that she inflicted the fatal blow. [¶] *An instruction the Court will give you, [']those who aid and abet a crime and those who directly perpetrate the crime are principals and equally guilty of the commission of the crime. You need not unanimously agree nor individually determine whether a defendant is an aider and abetter [sic] or the direct perpetrator. [¶] The jurors themselves need not choose among the theories so long as each are [sic] convinced of guilt. [¶] There may be a reasonable doubt that the defendant was the direct perpetrator and a similar doubt that he was the aider and abetter [sic], but no such doubt that he was one or the other.['] And isn't that what you have here. As I said before, some of you may believe Defendant Culuko did this crime, committed this murder. Some of you may think that Defendant Garcia did, and some of you, quite frankly may not know, but you cannot have any doubt that they each aided and abetted in the endangerment of this baby and that the natural and probable consequences of their conduct resulted in this baby's death.*" (Italics added.)[5]

The effect of the trial court's erroneous jury instructions in this case, as evidenced by the prosecutor's closing argument, was that they enabled the jury to convict both defendants of all the charged offenses without deciding that either of them committed those crimes and, in fact without having to agree on any fact pertinent to those convictions. The impact of this error was that it enabled the jury to convict defendants without requiring the

---

[5]Apart from the obvious error in advising the jury that they did not have to decide who committed what act, or even agree on what happened, the prosecutor also incorrectly told the jury that all they had to decide, in order to find both defendants guilty of murder, was that Joey's *death* was the natural and probable consequence of the target offense. Correctly stated, what the jury had to find in order to convict both defendants of murder was that one defendant killed Joey and in doing so acted with express or implied malice such that the killing constituted *murder* and that the murder was the natural and probable consequence of the target crime in which the other defendant aided and abetted.

prosecutor to prove their guilt beyond a reasonable doubt.[6] For this reason, I would reverse defendants' convictions on all counts and remand the matter to the trial court for new trials as to both defendants.

Appellants' petitions for review by the Supreme Court were denied May 24, 2000.

---

[6]The record reveals that the jury relied on the aiding and abetting theory in reaching its verdicts as evidenced by a note they sent during their deliberations asking the judge to clarify which counts that theory applied to. The judge responded that it applied to all counts. The jury rendered its verdicts almost immediately after receiving the judge's answer to their question and after only one full day of deliberations.