Filed 7/24/14  P. v. Grace CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B249353 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA085315) |
| v. | |
| DAVID JERMAINE GRACE, JR. et al., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Candace Beason, Judge.  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant, David Jermaine Grace.

Lynette Gladd Moore, under appointment by the Court of Appeal, for Defendant and Appellant, Ramon Robert Wright.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and  J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

Appellants Ramon Robert Wright and David Germaine Grace were each convicted, following a jury trial, of one count of first degree residential burglary in violation of Penal Code[1] section 459 and one count of conspiracy to commit burglary in violation of section 182, subdivision (a)(1). Following appellants' waiver of their jury trial rights, the trial court found true the allegations that each had suffered a prior serious or violent felony conviction within the meaning of sections 667 and 1170.12 (the Three Strikes law). The court sentenced appellant Grace to a total term of 13 years in state prison. Appellant Wright, who was on probation at the time of the current offenses, received a total term of 18 years, 4 months in state prison.

Appellants appeal from the judgment of conviction, contending there is insufficient evidence to support their convictions. We affirm the judgment.

Facts

On January 17, 2012, at about 9:15 a.m., Harry Yasuda and his wife left their home at 1274 Ridgecrest Street in Monterey Park.

At about 9:15 or 9:20 a.m., Darwin Sen, who lived at 1083 Ridgecrest, noticed a metallic orange car heading up the street at about forty miles per hour. Fifteen or twenty minutes later, Sen noticed the car go by again. About ten minutes later, Sen called 911. He told the operator that a 2010 or 2011 metallic orange Dodge Charger with out-of-state license plates was driving around the neighborhood and had driven down Ridgecrest twice in a fifteen minute span. Sen also told the 911 operator that there had previously been some burglaries in the neighborhood.

At 10:36 a.m., Monterey Park Police Department Officer Danny Salazar responded to Sen's 911 call. As Officer Salazar drove north on Ridgecrest, he saw an orange Dodge Charger parked just north of the Yasuda residence. Kiara Camacho was in the driver's seat, and the engine was running. Sen later identified Camacho from a photographic line-up at the driver of the car he had seen and reported. Officer Salazar

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

2

went up to the car and began talking to Camacho. Her cell phone began to ring continuously. Later, when the car was searched, police found two flathead screwdrivers and a box cutter in the trunk. These tools are often used by burglars to pry open windows or screens or to cut screens.

Other police officers came to the area. Officer Arthur Rousseau arrived at about 10:45 a.m. and began checking houses for signs of possible burglaries. At the Yasuda residence at 1274 Ridgecrest, he saw an open bathroom window from which the screen had been removed. He then saw that a sliding glass door at the rear of the house was partially open, and a screwdriver was on the floor beside it. While Officer Rousseau was investigating, Yasuda returned home. Yasuda inspected the house, noted that the contents of chests of drawers had been dumped out, and discovered that three watches and some collectible silver dollars were missing. One of the watches was a gold-plated Seiko.

Motorcycle Officer Jay Silverman came to the area at about the same time as Officer Rousseau, and saw appellant Wright, whom he believed to be a potential suspect. Officer Silverman approached appellant Wright and asked to speak with him. Appellant Wright walked away, crossing the street toward appellant Grace. When Officer Silverman walked toward the two men, they moved away and began to run. The men entered a parking lot. Officer Silverman called Officer Peter Palomino and told him two suspects were running away from him through the parking lot at 1576 Monterey Pass Road toward the 7-Eleven store at 1600 Monterey Pass Road.

Officer Palomino looked in the parking lot of the 7-Eleven store and saw appellant Wright standing on top of a dumpster. Appellant Wright then climbed up to the roof. Officer Palomino opened the lid of the dumpster and found appellant Grace inside. Appellant Wright eventually came down from the roof. A gold Seiko watch was found in appellant Wright's pocket.

Officer Rousseau showed the watch found in appellant Wright's pocket to Yasuda, and Yasuda responded that it was his. At trial, Yasuda put the watch on his wrist and showed that it fit him perfectly.

3

Sen later made a partial identification of appellant Grace as the front seat passenger of the car he had seen. Sen did not identify appellant Wright.

Telephone records showed that appellants called or attempted to call each other six times between 6:59 a.m. and 7:33 a.m. on the day of the burglary. Appellant Grace and Camacho exchanged text messages as early as 7:30 a.m. In one message, Camacho asked: "[W]e going in your car or mine." Between 10:07 a.m. and 10:37 a.m., the approximate time of the burglary, appellants made or attempted to make nine calls to each other.

While appellant Wright was in a courthouse lockup cell, he made a telephone call which was recorded by the Los Angeles County Jails' Inmate Telephone Monitoring System. Appellant Wright said: "I can beat it, I can really beat it. Cause they don't have no witnesses saying we was in that house, they don't have no evidence saying we was in - - - no evidence proving we was in that house. I got my stuff down on paper what I'm gonna give to my attorney to pull up the stuff because for a burglary you need these six facts that's for sure to make it a burglary . . . so I have to get that dropped. And I need that girl to come to court and say what she say. And if she say something different we can cross-examine her out and then they won't be able to use nothing she talking about. And then all they would have was that watch. That watch would be county time, receiving stolen property, and time served or something."

A few months later, appellant Grace made a telephone call from North County Correctional Facility which was recorded. Appellant Grace said: "You want to talk about motive? That's your motive. That's why people steal. Right? They don't steal, some people - - most people, they steal for financial reasons, money. [¶] I don't have a big brother to teach me or tell me to do this or that. Basically, I'm doing everything for you. I am fighting time. I'm doing all this [type] of shit so I can tell you not to do it. [¶] It ain't for me. It ain't for nobody. And it took this last time to see, damn, this ain't for me. The money, all this money shit ain't worth it, it ain't worth it at all."

4

Discussion

Appellants contend there is no evidence that they entered the Yasuda residence, and so there is insufficient evidence to support their convictions for burglary and conspiracy to commit burglary. We do not agree. There is substantial circumstantial evidence linking appellants to the conspiracy and the burglary.

"'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citations.]'" (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)

1. Burglary

The crime of burglary consists of the unlawful entry into a building with the intent to commit a felony or theft. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1041; §459.) If the building is an inhabited dwelling, the burglary is in the first degree. (§ 460, subd. (a).

a. Appellant Wright

Appellant Wright was found in possession of Yasuda's recently stolen watch near the location of the burglary.

"When . . . a defendant is found in possession of property stolen in a burglary shortly after the burglary occurred, the corroborating evidence of the defendant's acts,

5

conduct, or declarations tending to show his guilt need only be slight to sustain the burglary convictions. [Citations.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 176.)

Appellant Wright did not live in the area, and had no apparent reason to be there. Further, telephone records suggest that his presence in the area was not just random chance, but a planned trip with appellant Grace and Camacho. Camacho's car had tools in it which could be used for burglary. Thus, the circumstances of appellant Wright's presence in the area had a slight tendency to show guilt.

When police tried to speak with appellant Wright, he fled, which supports an inference of consciousness of guilt. Later, while awaiting trial, appellant Wright implicitly acknowledged that the watch was stolen, stating: "And then all they would have was that watch. That watch would be county time, receiving stolen property . . . ." He also stated that he would "beat the rap" because the prosecutor did not have any evidence he was in the house rather than stating that he would win because he was innocent. Viewing the evidence in the light most favorable to the judgment, these statements can be reasonably understood as showing a consciousness of guilt.

Appellant Wright's possession of the recently stolen watch near the burglarized residence, together with the circumstances surrounding his presence in the area and his acts and statements showing consciousness of guilt, is sufficient evidence to support his burglary conviction.

We do not agree with appellant Wright that the evidence is insufficient to show that the watch in his pocket belonged to Yasuda because the watch was mass-produced with no distinctive markings. The watch matched the description Yasuda gave to police before appellants were detained. When shown the watch by police, Yasuda said it was his. Yasuda testified that he had received the watch as a present for his 45th wedding anniversary and so had had the watch for well over ten years. He showed the jury that the watch fit him "perfectly." It is more than reasonable to infer that the watch was Yasuda's watch. It is much less reasonable to infer that the ten year old watch belonged to twenty year old appellant Wright, who just happened to be carrying it in his pocket

6

when detained by police near the location where Yasuda's identical watch was stolen and within a short time after the theft occurred.

b. Appellant Grace

No stolen property was found on appellant Grace. There is, however, substantial evidence to show that he aided and abetted appellant Wright in the commission of the burglary.

"'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.'" (*People v. Culuko* (2000) 78 Cal.App.4th 307, 326-327.) Aiding and abetting a general intent crime does not requires a specific intent. (*People v. Torres* (1990) 224 Cal.App.3d 763, 770.) "The aider and abettor may have only the vaguest idea of the precise 'act' by which the perpetrator will commit the crime." (*People v. Culuko, supra*, 78 Cal.App.4th at p. 327.)

"Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense." (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094.) Here, all three factors support a finding that appellant Grace aided and abetted appellant Wright in the commission of the burglary.

Appellant Grace was discovered near the scene of the burglary around the time the burglary occurred. Appellant Grace's involvement with appellant Wright began before the burglary and continued until the men were arrested by police. Appellants called or attempted to call each six times between 6:59 a.m. and 7:33 a.m. This activity supports an inference of planning, particularly when considered with appellant Grace's contemporaneous texts with Camacho about transportation. Appellants called or attempted to call each other nine times between 10:02 a.m. and 10:37 a.m., during the estimated time of the commission of a burglary. These calls support an inference that appellant Grace was acting as a look-out, or in some other support role. Once police

7

arrived at the scene, appellants fled from police together, supporting an inference of consciousness of guilt.

2. Conspiracy

"A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416.)  The commission of the target offense in furtherance of the conspiracy satisfies the overt act requirement. (*People v. Jurado* (2006) 38 Cal.4th 72, 121.)

"The act of one conspirator is the act of all.  Each is responsible for everything done by his coconspirators, including those things that follow as the probable and natural consequences of the execution of the conspiracy." (*People v. Zacarias* (2007) 157 Cal.App.4th 652, 657.)

"To prove an agreement, it is not necessary to establish the parties met and expressly agreed; rather, 'a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design.'" (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1025.)

There is ample circumstantial evidence to support appellants' convictions for conspiracy to commit burglary.

As we discuss, above, there is substantial evidence to show that appellants committed a burglary.  This same evidence is sufficient to show a pre-existing conspiracy to commit that burglary

Appellants made repeated phone calls to each other on the morning of the burglary and at the same time appellant Grace was exchanging texts with Camacho about transportation.  Camacho and appellant Grace were observed driving around Yasuda's neighborhood before the time of the burglary.  Appellant Wright was later found on foot

in the same area. None of the three lived in the area or had any apparent reason to be there. It is more than reasonable to infer that the three agreed to come to the area for a specific purpose.

Camacho's car contained a box cutter and two flathead screwdrivers, which are often used by burglars. This supports an inference that appellants came to the area for the purpose of committing a burglary.[2] Appellants called or attempted to call each other nine times during the period of the burglary, again suggesting coordinated and preplanned action. As we discuss above, the evidence shows the men did commit a burglary, thus satisfying the overt act requirement.

Appellant Wright relies on *People v. Powers-Monachello* (2010) 189 Cal.App.4th 400 for the proposition that mere association prior to an offense is not sufficient to establish a conspiracy to commit the offense. Appellant Wright is certainly correct that mere association is not sufficient to prove a conspiracy, but more than mere association was present here. As we discuss, appellants both went to the location of the burglary at the same time, both remained in the area during the time the burglary was committed, they communicated or attempted to communicate with each other during the time the burglary was being committed and both fled the scene together when police arrived. The coordinated nature of appellants' behavior supports a reasonable inference that the behavior was agreed upon in advance.

---

[2]    Although the tools remained in the car during the Yasuda burglary, it appears that no tools were needed to force entry into the Yasuda residence.

9

Disposition

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


MINK, J.[*]


We concur:


TURNER, P. J.


KRIEGLER, J.

---

[*] Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.