Filed 7/22/21  P. v. Lopez CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C090537 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE013856) |
| v. | |
| ALEXANDER LOPEZ, | |
| Defendant and Appellant. | |

A jury found defendant Alexander Lopez guilty of second degree murder (Pen. Code, § 187, subd. (a))[1] and found true an allegation that a principal in the offense was armed with a firearm (§ 12022, subd. (a)(1)).  The trial court sentenced defendant to 15 years to life in prison, plus an additional year for the firearm enhancement.  Defendant

---

[1] Undesignated statutory references are to the Penal Code.

1

appeals, arguing the evidence was insufficient to convict him as an aider and abettor.  We disagree and affirm.

## I.  BACKGROUND

M.J. was working as an attendant at a Sacramento gas station on the evening of July 25, 2017.  M.J. was outside, cleaning the front parking lot just before 10:00 p.m.  He watched as a battered car pulled into the parking lot and backed into a space next to a retaining wall running perpendicular to the storefront and gas pumps.  A man, later identified as Rudy Z., got out of the car on the driver's side and stood near the wall.[2] M.J. began sweeping the area in front of the store, moving towards the wall and the parked car.  As he drew closer, M.J. asked the driver, "Amigo, what happened to your vehicle?"  Around that time, a second man, later identified as defendant, emerged from the passenger's side of the parked car.  M.J. recognized defendant and Rudy as occasional customers at the gas station.

Defendant "kind of pushed" M.J. in the chest, saying, "Don't come closer; you go away from here."  M.J. thought that defendant seemed drunk.  Rudy said to M.J., "You know what, he's a nice guy; don't say anything to him."  M.J. continued sweeping, and Rudy went into the store.  Defendant got back into the car on the passenger's side.

Moments later, Rudy emerged from the store with a box of Modelo beer.  He returned to the car and took his seat behind the steering wheel.  As he did so, a third man, later identified as Ramon Z., appeared at the gas station, seemingly on foot.  Ramon, then age 15, approached the car on foot.  The car had by now begun to pull out from the parking space.  The car stopped, and Ramon leaned over next to the driver's side window.  Ramon spoke with the occupants of the car for approximately 40 seconds.

---

[2] Rudy and Ramon Z. are brothers, who each play a role in this case.  We will refer to them by their first names for clarity.  Defendant is Rudy and Ramon's uncle.

2

In the meantime, M.J. finished sweeping and emptied the trash cans in front of the store. M.J.'s coworker, Simranjit Singh, made several trips carrying recycling from the store to the dumpsters around the corner. M.J. kept an eye on the car as he worked. M.J. recognized Ramon as another customer of the gas station.

The conversation between Ramon and the occupants of the car came to an end. Singh emerged from the store carrying a large quantity of cardboard recycling. Singh headed towards the dumpsters. M.J. busied himself near the front of the store.

Ramon started walking towards the store. The car started moving towards the store as well, moving in a slow zigzag that forced Ramon to walk behind, and then to the side.

Ramon approached M.J., who was standing near the door to the store. Ramon, who was wearing gloves, asked M.J., "Why are you looking at us?" M.J. responded, "I'm not looking at you; I'm looking at my parking lot, whether it is clean or not."

While these events were unfolding, the car was moving slowly past the front door of the store. Video from the store's surveillance cameras shows defendant sitting in the passenger's seat and craning his neck to watch the confrontation between Ramon and M.J. Defendant appears to be smiling broadly and laughing or giggling. The car came to a stop halfway between the store and the gas pumps, and defendant slowly opened the door, taking care to place his beer in the center console.

As defendant was emerging from the car, Ramon suddenly punched M.J. in the face, causing his glasses to go flying. M.J. grabbed a broom and swung, striking Ramon in the side and causing him to retreat. Defendant had by now emerged from the car. Singh was standing nearby. M.J. ran inside to call police. Ramon, still retreating, crossed in front of defendant. Ramon stopped on defendant's left side, just a few feet away. Defendant watched as Ramon withdrew a gun from the waistband of his shorts and racked the slide. He then raised his arm and pointed at Singh, who was standing near

3

the store. Defendant walked towards Singh with his arm extended, still pointing and seeming to smile. Ramon raised the gun and fired at Singh.

Ramon shot Singh 12 times, in rapid succession. Defendant reacted to the shots by bringing his outstretched arm to his chest and hunching his shoulders, as if to protect himself from the expended shells. He then turned and walked slowly back to the car. The car drove away, leaving Singh dead on the ground.

The trio made their way to the home of defendant's sister (Rudy and Ramon's mother). Defendant passed out on the living room sofa; it was obvious that he had been drinking. Rudy and Ramon left their mother's home in the night. She later received word that they had gone to Mexico. Police arrived in the early hours of the morning.

Defendant was arrested and charged by amended consolidated felony complaint with murder. The complaint further alleged that a principal in the offense was armed with a firearm. Defendant pled not guilty and denied the allegation. The matter was tried to a jury over the course of four days in January 2019. The prosecution's witnesses testified substantially as described *ante*. M.J. also testified that he did not hear anything that might have been said between Ramon and Rudy or defendant, and he did not see a gun that night. Defendant's sister (and Ramon's mother) also testified that defendant and Ramon were very close, and defendant acted as a surrogate father to Ramon. Defendant testified on his own behalf.[3]

As relevant here, defendant testified he smoked marijuana and drank 15 beers on the day of the murder. He explained that he struggled with alcohol and often had difficulty remembering things as a result of his drinking.

Defendant remembered going to the gas station on the night of the murder and remembered M.J. approaching him in the parking lot. Defendant suggested that he

---

[3] Defendant's mother and ex-wife also testified for the defense. Their testimony does not have any bearing on any issue on appeal.

4

thought that M.J. was getting too close to him, adding that he "put [his] hands out" and told him to "get back." Defendant testified that he recognized M.J. and Singh as a customer of the gas station and had never had any problems with either of them before.

Defendant testified he next remembered Ramon appearing at the gas station as they were preparing to leave. Defendant recalled that Ramon argued with Rudy, and Rudy told Ramon to get in the car. Ramon approached M.J. instead. Defendant acknowledged watching and laughing as Ramon initiated an altercation with M.J. Defendant explained that the altercation prompted him to open the car door and get out. According to defendant, "it was time for me to tell Ramon to get his ass back in the car." He added, "I knew he was—most likely the police were coming. And so I was telling Ramon to get in the car so we can go home."

Defendant next remembered seeing Singh come around the corner. However, defendant testified that he thought Singh was M.J. According to defendant, "It kind of surprised me to see him come around the corner so I was telling him to get back and for the other guy to get in the car—Ramon to get in the car." When he pointed to Singh (who he thought was M.J.), defendant explained, he was merely telling him to "get back" or "[s]tay back." Defendant testified that he was surprised to hear gunshots a few seconds later.

Throughout his testimony, defendant insisted he had no idea Ramon had a gun or intended to shoot anyone. Defendant further testified that he harbored no animosity towards Singh or M.J., did not want Ramon to shoot Singh, and did not encourage Ramon to shoot Singh.

During closing argument, the prosecutor argued that defendant, drunk, initiated an aggressive encounter with M.J. in the parking lot. The prosecutor observed that Ramon was not present for defendant's initial encounter with M.J., but immediately approached the gas station attendant after speaking with defendant and Rudy. The prosecutor argued that Ramon would have had no way of knowing there had been any issue with M.J., and

5

no reason to confront him, had he not discussed the matter with defendant and Rudy. The prosecutor also argued that no one in the car made any attempt to stop Ramon from provoking an altercation with M.J., or to stop Ramon after the altercation with M.J. was over. Rather, the prosecutor argued, defendant stood by and watched as Ramon pulled the gun from his waistband and racked the slide. He then pointed to Singh. The prosecutor theorized that Ramon idolized defendant and was more than willing to do as he directed.

Defense counsel argued the prosecution's theory of the case made no sense. Defense counsel argued that defendant's initial encounter with M.J. was not a big deal; defendant was obviously drunk and M.J. continued cleaning the parking area, with nothing to suggest that he was hurt or upset. Defense counsel argued that the incident was over by the time Ramon came along, and there was no evidence that defendant or Rudy said anything to him about it. Defense counsel maintained that Rudy made an effort to get Ramon in the car by cutting him off as he walked towards the store. Defense counsel argued there was no evidence defendant knew Ramon had a gun or intended to shoot Singh. He argued the gun was only visible to defendant for two or three seconds before the fatal shots were fired, which was not enough time for defendant to form the requisite intent. Defense counsel emphasized that defendant was drunk and argued that he seemed almost to walk into the line of fire, suggesting he did not know that shots would be fired. Defense counsel ended by opining that the prosecutor had failed to prove beyond a reasonable doubt that defendant knew Ramon had a gun and failed to prove that he had the specific intent to kill.

The jury returned a verdict after deliberating for one full day and two partial days. The jury found defendant guilty of second-degree murder and found the firearm enhancement to be true. The trial court sentenced defendant to 15 years to life in prison, plus an additional year for the firearm enhancement. This appeal timely followed.

6

## II. DISCUSSION

Defendant challenges the sufficiency of the evidence to support the conviction for second degree murder. He argues the evidence showed only that he was present at the scene but failed to show he was aware of Ramon's murderous intent or aided and abetted Ramon in shooting Singh. We are not persuaded.

In reviewing the sufficiency of the evidence, "the reviewing court must determine from the entire record whether a reasonable trier of fact could have found that the prosecution sustained its burden of proof beyond a reasonable doubt. In making this determination, the reviewing court must consider the evidence in a light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment. . . . The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt." (*People v. Mincey* (1992) 2 Cal.4th 408, 432.) So long as there is substantial evidence, the appellate court must affirm, even if other substantial evidence would have supported a different result. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874.)

Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). "If the circumstances reasonably justify the [trier of fact's] findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) Instead, reversal is warranted only if "it appears 'that upon no hypothesis whatever is there sufficient

7

substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  This standard of review is applicable whether the prosecution relies primarily on direct or circumstantial evidence.  (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

Defendant was tried as an aider and abettor.  "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."  (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)  In a murder case, this means that "the aider and abettor must know and share the murderous intent of the actual perpetrator."  (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.)  "However, the aider and abettor need not have advance knowledge of the crime or the perpetrator's intent.  'Aiding and abetting may be committed "on the spur of the moment," that is, as instantaneously as the criminal act itself.' "  (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1148.)

Although ordinarily mere failure to prevent a crime is not enough to constitute aiding and abetting (*People v. Culuko* (2000) 78 Cal.App.4th 307, 331), it is among the factors that may be considered, as are presence at the scene of the crime, companionship, and conduct before and after the offense.  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054; *In re Juan G.* (2003) 112 Cal.App.4th 1, 5; *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094-1095.)  " 'Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.' "  (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

Defendant argues no evidence shows he was aware of Ramon's murderous intent or took any affirmative action to aid or abet the murder.  We disagree.  The evidence showed that defendant and Ramon were especially close.  Defendant had an unpleasant encounter with M.J. in the parking lot.  Ramon showed up less than five minutes later.

8

He spoke with Rudy and defendant for approximately 40 seconds. He then approached M.J. Ramon punched M.J. within two minutes of arriving at the gas station. Defendant can be seen smiling and laughing as Ramon precipitates the altercation. From this evidence, the jury could reasonably infer that defendant encouraged Ramon to pick a fight with the gas station attendant, setting in motion the chain of events that would lead to Singh's death.

Approximately 11 seconds elapsed between the time Ramon punched M.J. and the time he shot Singh. During this time, defendant emerged from the car and Ramon retreated from the broom-wielding M.J. Ramon crossed in front of defendant and stopped less than a car-length away, well within defendant's direct line of sight. The video shows defendant watching as Ramon withdraws the gun from his waistband and racks the slide. The video also shows defendant raising his arm and pointing at Singh. The video then shows defendant advancing towards Singh with arm outstretched, still pointing and seeming to smile. We have watched the video several times and have little difficulty concluding that defendant's gesture and demeanor could reasonably be construed as encouragement to shoot. That defendant may not have had advance knowledge that Ramon would shoot Singh does not convince us otherwise. (*People v. Frandsen, supra*, 33 Cal.App.5th at p. 1148 [aiding and abetting may be committed " ' "on the spur of the moment" ' "].)

Defendant's subsequent actions further support the view that he intentionally facilitated or encouraged the shooting. Although defendant reacted to the gunfire by hunching his shoulders and bringing his arm to his chest, nothing suggests he was surprised or frightened by Ramon's actions. If anything, defendant's demeanor suggests he was unsurprised, raising an inference he supported Ramon's intentions. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409 [evidence that defendant was unsurprised by another's conduct supported the inference that the defendant acted to assist the conduct].) After the shooting, defendant calmly turned and walked away. He made no attempt to

9

check on Singh or call for help. This conduct, too, supports an inference that defendant aided and abetted the murder. (See, e.g., *People v. Hoang* (2006) 145 Cal.App.4th 264, 270 [a person's making no attempt to determine whether a victim was injured or call for help supported the inference that the person aided and abetted an assault].) On the record before us, we conclude that substantial evidence supports the jury's finding that defendant offered support and encouragement to Ramon, thereby aiding and abetting the murder.

Defendant offers an alternative interpretation of the evidence. He rejects the prosecutor's theory that the encounter with M.J. set in motion a chain of events that ended with the shooting. He argues the encounter was "very brief" and "quickly diffused." He observes there was no direct evidence that anyone discussed the incident with Ramon. He notes that M.J. had been watching Ramon, giving Ramon an independent reason to approach and confront him. He emphasizes the rapidity with which events escalated, calling particular attention to the abbreviated time (two or three seconds) in which Ramon produced the gun and racked the slide. He observes that someone in his position could have believed that Ramon was brandishing the gun for purposes of intimidation. He renews the argument that he was merely motioning for Singh to get back, not signaling for Ramon to shoot.[4] He insists he was merely present at the scene, noting that he was also very drunk. We need not address these arguments, as they amount to nothing more than an invitation to reweigh the evidence, which we cannot do. As we have explained, there was substantial evidence that defendant shared Ramon's murderous intent and aided and abetted the shooting. The existence of conflicting evidence is not grounds for reversal.

---

[4] Defendant also argues that he "was already gesturing with his finger at Mr. Singh prior to Ramon retrieving the firearm from his waistband." The video does not support this contention.

10

### III.  DISPOSITION

The judgment is affirmed.


/S/

_____

RENNER, J.


We concur:


/S/

_____

BLEASE, Acting P. J.


/S/

_____

MURRAY, J.

11