Filed 6/12/24  P. v. Henson CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B324464 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA212538) |
| v. | |
| DONALD RAYE HENSON, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Shelly Torrealba, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Supervising Deputy Attorney General, and Nikhil Cooper, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

In 2001 Donald Raye Henson was a participant (but not the shooter) in a drive-by shooting that left one person dead and another injured. A jury convicted Henson and the shooter, Dante Brown, of first degree murder and attempted murder, and we affirmed the convictions. (*People v. Brown* (Sept. 13, 2004, B162138) [nonpub. opn.] (*Brown*).)

Henson appeals from the superior court's order denying his petition for resentencing under Penal Code section 1170.95 (now section 1172.6) following an evidentiary hearing.[1] Henson argues that substantial evidence did not support the court's finding beyond a reasonable doubt Henson was a direct aider and abettor who acted with the specific intent to kill and that the superior court improperly relied on our opinion in *Brown*. We conclude that substantial evidence supported the court's findings and that any error in relying on our opinion in *Brown* was harmless. Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Following a Drive-by Shooting, Police Arrest Brown and Henson*

On January 16, 2001 Hashim Keaton and Anthony Stubbs, a member of the Rollin' 20's Bloods criminal street gang, were walking on a sidewalk. A car slowed down as it approached, and the driver of the car shot at them seven to 10 times with a nine-millimeter semiautomatic handgun. Stubbs, who was closer to

---

[1] Statutory references are to the Penal Code.

2

the street, was hit four times, including once in the face; Keaton was hit in the leg.

Police officers arrived 10 minutes after the shooting. An officer asked Stubbs who shot him, and Stubbs said: "They yelled 'West Boulevard' as they shot me, two black guys in a small red compact car." Keaton similarly described the assailants as two black men in a red compact car. Stubbs died the next day.

Two days after the shooting, Godwin Lopez, a member of the Black P Stones criminal street gang, was leaving an apartment building when two black men approached him. One of the men said to Lopez, "come here" and "fuck Slobs"—according to Lopez, a disrespectful term for members of Lopez's gang. Lopez started to run away, the men chased him, and Lopez heard eight or nine gunshots (none of which hit him). Lopez continued running down streets and through alleyways for 10 to 15 minutes, eventually stopping at a bus stop in front of a gas station. As a bus was arriving, a red car with two male occupants approached. One of the men got out of the car and started walking toward Lopez, but Lopez boarded the bus.

Soon after Lopez's encounter with his assailants, police officers observed a red car that matched the description of the car involved in the shooting of Keaton and Stubbs. Brown was driving, and Henson was in the passenger's seat. When police began to follow the car, it sped away, but after a few minutes, it stopped. Henson got out of the car, ran to a nearby apartment complex with police officers in pursuit, and tried unsuccessfully to enter the complex through a locked gate. The officers detained Henson, found a loaded, nine-millimeter semiautomatic handgun in his pocket, and arrested him. Meanwhile, Brown drove the car

3

away, parked, and attempted to flee into a market, but officers detained and arrested him.

Later that day, a detective visited Keaton in the hospital, where he was recovering from his gunshot wounds. The detective showed Keaton two photographic lineups, one containing a photograph of Brown, the other of Henson. Keaton told the officer that Brown looked like the driver of the red compact car and the person who shot him. Keaton did not identify Henson. The detective also showed Keaton a photograph of the red car Brown and Henson were in immediately before officers arrested them. Keaton stated he was "positive" the car was the same car involved in his shooting.

Lopez reported his attack to police officers. Officers showed Lopez a photographic lineup containing a photograph of Brown, and Lopez stated Brown "look[ed] like the guy" who shot at him.

B.    *The People Charge Brown and Henson with, and Try Them for, Murder and Attempted Murder*

The People charged Brown and Henson with the murder of Stubbs and the attempted murder of Keaton.[2] Brown's girlfriend at the time of the shootings, Monique Penister, testified for the People at trial. Penister owned the red car Brown and Henson were in the day of their arrests. She also lived in the apartment complex Henson was attempting to enter when officers arrested him. According to Penister, Brown and Henson were members of the West Boulevard Crips, and Brown had been living with Penister immediately before the shootings. The night before the

---

[2]    The People also charged Brown and Henson with the attempted murder of Lopez, but the jury acquitted them on that charge.

4

shooting of Stubbs and Keaton, Brown and Henson slept at Penister's apartment. The next morning, Henson left the apartment with a nine-millimeter handgun he owned, tucked into the waistband of his pants. An hour later, around the time Stubbs and Keaton were attacked, Brown borrowed Penister's car and left the apartment. He returned 15 to 20 minutes later, and Penister saw Henson sitting on the steps of her apartment building.

Detectives searched Penister's home and recovered six rounds of nine-millimeter ammunition from a drawer. Penister testified that the ammunition belonged to Henson and that on previous occasions she had seen Henson load ammunition into his handgun.

The Los Angeles County Sheriff's Department recorded a conversation between Henson, his father, his aunt, and another woman that took place in a county jail after Henson's arrest. Henson and the others discussed that they would "beat on" Penister, that she was not "supposed to say" she loaned Brown her car, and that they would "intimidate" her to prevent her from testifying. Penister testified that, on the day of the recorded conversation, she had visited Brown at the jail and that, as she was leaving, Henson told her, "Bitch, I will have you killed."

Law enforcement recovered several nine-millimeter shell casings from the location of the Stubbs/Keaton shooting. The casings were manufactured by two different ammunition companies. The handgun police officers found in Henson's possession when they arrested him contained ammunition manufactured by both companies, and the ammunition in Penister's home was manufactured by one of the two companies. A firearms examiner testified that he had compared the handgun

in Henson's possession to the shell casings recovered from the location where Stubbs and Keaton were shot and that the handgun had discharged the casings.

Officer Chris Luna of the Los Angeles Police Department testified as a gang expert for the prosecution. According to Officer Luna, the West Boulevard Crips were rivals of both the Rollin' 20's Bloods (Stubbs's gang) and the Black P Stone Bloods (Lopez's gang). Officer Luna testified that, in his opinion, the West Boulevard Crips would benefit from the drive-by shooting of Stubbs and Keaton. He explained that the perpetrators were "searching out for rival gang members"; "yelling out their gang, which lets everyone within earshot know who exactly committed the drive-by shooting"; and demonstrating that the West Boulevard Crips "is a street gang that demands respect," "will carry out their threats," and is "not afraid of committing drive-by shootings in broad daylight." In Officer Luna's opinion, the shooting would also enhance the reputation of the gang members who participated in the shooting.

C.   *The Jury Convicts Brown and Henson, and We Affirm*

The jury convicted Brown and Henson of first degree murder (Stubbs) and attempted murder (Keaton). The jury found true the allegation the "attempted murder was committed willfully, deliberately and with premeditation within the meaning of . . . section 664." The jury also found true allegations that a principal personally and intentionally discharged a firearm that caused great bodily injury or death, within the meaning of section 12022.53, and that Brown and Henson committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang to promote, further, or assist in

6

criminal conduct by gang members, within the meaning of section 186.22. The trial court sentenced Brown and Henson to aggregate prison terms of 75 years to life, plus life terms.

Brown and Henson appealed. Among other arguments, Brown and Henson argued the trial court erred in instructing the jury on the natural and probable consequences doctrine under then-existing law. The trial court had instructed the jury:

"In order to find the defendant guilty of the crimes of murder and/or attempted murder . . . you must be satisfied beyond a reasonable doubt that:

"(1) The crimes of assault with a firearm were committed;

"(2) That the defendant aided and abetted those crimes;

"(3) That a co-principal in that crime committed the crimes of assault with a firearm; and

"(4) The crimes of murder and/or attempted murder were a natural and probable consequence of the commission of the crimes of assault with a firearm . . . ."

We agreed with Brown and Henson the instruction was improper. We explained that, under then-existing law, to find a person who aided and abetted a criminal act (i.e., the target offense) liable for murder or attempted murder under the natural and probable consequences doctrine, the jury had to find "the actual perpetrator [of the murder or attempted murder] harbored malice (either express or implied)." The instruction "misstated the law because it informed the [jurors] they could convict the aider and abettor of murder and attempted murder based merely on a finding the perpetrator possessed the intent to commit an assault with a deadly weapon (the target offense). The instruction failed to tell them that they had to find the perpetrator harbored malice for murder and attempted

7

murder . . . ." (*Brown, supra*, B162138; see *People v. Culuko* (2000) 78 Cal.App.4th 307, 322.)

We held, however, the error was harmless because the verdict forms reflected the jury necessarily found Brown and Henson guilty on valid theories of murder and attempted murder. We explained that, in addition to giving the erroneous instruction on the natural and probable consequence doctrine, the trial court instructed the jurors that they could convict Brown and Henson of murder and attempted murder if they had the intent to kill. Because the jury "clearly found that Brown and Henson committed" the attempted murder of Keaton "deliberately and with premeditation within the meaning of Penal Code section 664, subdivision (a)," we concluded "the jury must have concluded" whichever defendant perpetrated the attempted murder of Keaton "possessed the requisite mental state (malice) for the attempted murder . . . ." We also concluded that, because "the murder of Stubbs occurred during the same, uninterrupted shooting spree which injured Keaton, . . . the jury must have also relied upon the correct murder theory" in finding Brown and Henson guilty of the murder of Stubbs—i.e., the perpetrator of the murder had malice aforethought. Therefore, we affirmed the convictions. (*Brown, supra*, B162138.)

D.    *Henson Files a Petition for Resentencing, Which the Superior Court Denies*

In 2019 Henson filed a petition for resentencing under section 1172.6, which, as amended effective January 1, 2022, authorizes certain individuals "convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based

solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter" to petition the superior court for resentencing. Henson checked boxes on a form petition for resentencing stating that he had been convicted of first degree murder under the natural and probable consequences doctrine; that he was not the actual killer, and did not, with the intent to kill, aid, or abet the actual killer in the commission of the murder; and that he could not now be convicted of first or second degree murder because of changes the Legislature made to sections 188 and 189. Henson later filed a supplemental request for resentencing, contending that he had been convicted of attempted murder under the natural and probable consequences doctrine and that he could not now be convicted of attempted murder because of amendments to section 1172.6 effective January 1, 2022. After the People conceded Henson had established a prima facie case, the superior court issued an order to show cause and set an evidentiary hearing.

At the evidentiary hearing the superior court considered the reporter's transcript, the jury instructions, the verdicts, and our opinion in *Brown*, *supra*, B162138. In a written decision the court found beyond a reasonable doubt Henson was guilty of the murder of Stubbs as a direct aider and abettor who acted with the specific intent to kill. The court relied on evidence that Brown and Henson were members of the West Boulevard Crips gang and that the murder victim, Stubbs, was a member of a rival gang; that on the day of the shooting Henson left Penister's apartment with a nine-millimeter handgun, Brown drove Penister's car, and the two returned together shortly after the shooting; that two days later Henson and Brown were driving in

9

the same car; and that, when law enforcement officers apprehended Henson, he was in possession of a nine-millimeter handgun, which ballistics evidence confirmed was the gun used to shoot Stubbs and Keaton. For the attempted murder of Keaton, the superior court similarly found beyond a reasonable doubt Henson acted with the specific intent to kill. Relying on the Supreme Court's opinion in *People v. Stone* (2009) 46 Cal.4th 131, the superior court ruled Henson aided and abetted Brown, who shot at Stubbs and Keaton "intending to kill one in the group, but not knowing or caring which one . . . ." The court denied the petition, and Henson timely appealed.

## DISCUSSION

### A. *Section 1172.6*

Effective 2019, the Legislature substantially modified the law governing accomplice liability for murder, eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Curiel* (2023) 15 Cal.5th 433, 444 (*Curiel*); *People v. Reyes* (2023) 14 Cal.5th 981, 986) and significantly narrowing the felony-murder exception to the malice requirement for murder (§§ 188, subd. (a)(3), 189, subd. (e); see *Curiel*, at p. 448; *People v. Wilson* (2023) 14 Cal.5th 839, 868-869 (*Wilson*).) Section 188, subdivision (a)(3), now prohibits imputing malice based solely on an individual's participation in a crime and requires proof of malice to convict a principal of murder, except under the revised felony-murder rule in section 189,

subdivision (e).  (*Curiel*, at p. 449; *People v. Gentile* (2020) 10 Cal.5th 830, 842-843.)

Section 1172.6 authorizes an individual convicted of felony murder or murder based on the natural and probable consequences doctrine, attempted murder based on the natural and probable consequences doctrine, or manslaughter to petition the superior court to vacate the conviction and be resentenced on any remaining counts, if the petitioner could not now be convicted of murder or attempted murder because of the changes the Legislature made effective 2019 to the definitions of the crime. (See *Wilson*, *supra*, 14 Cal.5th at p. 869; *Curiel*, *supra*, 15 Cal.5th at pp. 449-450.)  If a section 1172.6 petition contains all the required information, the court must appoint counsel to represent the petitioner, if requested.  (*People v. Lewis* (2021) 11 Cal.5th 952, 962-963; see § 1172.6, subd. (b)(1)(C), (3).)  The court must then hold a hearing to determine whether the petitioner has made a prima facie showing he or she is entitled to relief. (§ 1172.6, subd. (c); see *People v. Hurtado* (2023) 89 Cal.App.5th 887, 891.)

Where the petitioner has made the requisite prima facie showing he or she is entitled to relief under section 1172.6, "the court must issue an order to show cause (§ 1172.6, subd. (c)) and hold an evidentiary hearing at which the prosecution bears the burden 'to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under the law as amended . . . ."  (*Wilson*, *supra*, 14 Cal.5th at p. 869; see § 1172.6, subd. (d)(3); *Curiel*, *supra*, 15 Cal.5th at p. 450.)  At the hearing the court may consider evidence "previously admitted at any prior hearing or trial that is admissible under current law," including witness testimony.  (§ 1172.6, subd. (d)(3); see *Wilson*,

11

at p. 869.) The petitioner and the prosecutor may also offer new or additional evidence. (§ 1172.6, subd. (d)(3); see *Wilson*, at p. 869.) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3); see *Wilson*, at p. 869; *People v. Strong* (2022) 13 Cal.5th 698, 709.)

On appeal from an order denying a petition under section 1172.6 after an evidentiary hearing, we review the superior court's factual findings for substantial evidence. (*People v. Reyes*, *supra*, 14 Cal.5th at p. 988; see *People v. Hill* (2024) 100 Cal.App.5th 1055, 1065; *People v Pittman* (2023) 96 Cal.App.5th 400, 420.) "In reviewing the trial court's findings for substantial evidence, we . . . examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the necessary fact] beyond a reasonable doubt. . . . While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Pittman*, at p. 420, internal quotation marks omitted; see *People*

*v. Underwood* (2024) 99 Cal.App.5th 303, 314; *People v. Oliver* (2023) 90 Cal.App.5th 466, 480.)

      B.    *Substantial Evidence Supported the Superior Court's Findings Henson Is Guilty of Murder and Attempted Murder*

      1.    *Applicable Law*

Murder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  Malice "may be express or implied."  (§ 188, subd. (a).)  "It is express when there is a manifest intent to kill."  (*Gentile*, *supra*, 10 Cal.5th at p. 844; see § 189.)  "Attempted murder," like express malice murder, "requires the specific intent to kill . . . ."  (*People v. Sanchez* (2016) 63 Cal.4th 411, 457; see *People v. Stone*, *supra*, 46 Cal.4th at p. 139.)

"'[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another [e.g., murder] if the accomplice aids the commission of that offense with "knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends."'"  (*Curiel*, *supra*, 15 Cal.5th at p. 463.)  "'[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator [e.g., murder or attempted murder], (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus— conduct by the aider and abettor that in fact assists the achievement of the crime.'"  (*People v. Vargas* (2022)

13

84 Cal.App.5th 943, 953-954; see *Curiel*, at p. 467; see also *People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 ["'[t]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing'"].)

> 2. *Substantial Evidence Supported the Superior Court's Findings Henson Knew Brown Intended To Kill and Intended To, and Did, Assist Brown*

Henson does not challenge the superior court's finding Brown had the intent to kill when he murdered Stubbs and attempted to murder Keaton. Henson contends only that substantial evidence did not support the court's findings on the second and third elements of aiding and abetting liability: (b) that he knew Brown intended to kill and intended to assist Brown in killing and (c) that his conduct in fact assisted Brown in killing. Substantial evidence, however, supported these findings.

The evidence, viewed in the light most favorable to the superior court's findings (see *People v. Hill*, *supra*, 100 Cal.App.5th at p. 1066; *People v. Cody* (2023) 92 Cal.App.5th 87, 111), was that Henson and Brown were at Penister's apartment the morning of the shooting, that Henson left with his nine-millimeter handgun, and that Brown left the apartment a little later in Penister's car and picked up Henson. Brown fired seven or eight shots from Henson's nine-millimeter handgun at Keaton and Stubbs while Henson and Brown were in the car. Henson and Brown yelled "West Boulevard" as Brown shot Keaton and Stubbs. Brown and Henson returned together to Penister's apartment. Two days later, Brown and Henson jointly

14

accosted another rival gang member, Lopez. At least one of the men fired several shots at Lopez, and they followed Lopez in Penister's car as Lopez fled. When police found Brown and Henson later that day, Henson still had his nine-millimeter handgun in his possession.

From this evidence the superior court could reasonably infer that Henson knew Brown intended to kill Stubbs and Keaton and that Henson intended to assist Brown in killing them. Henson and Brown were members of the same gang,[3] they were frequently together (including on the morning of the shooting), Henson owned the murder weapon and was in possession of it shortly before the shooting, Henson yelled out his gang affiliation during the shooting, and the two men committed the shooting and another violent assault within days of each other. (See *People v. Johnson* (2016) 62 Cal.4th 600, 630 [jury could "infer[ ] from defendant's substantial participation in the events leading up to [the victim's] death that he knew of the plan

---

[3] That Brown and Henson were members of the West Boulevard Crips was essentially undisputed. In addition to Penister's testimony they were members of the gang, Officer Luna testified that he knew Brown and Henson and that they had told him and other officers they were members of the gang. The prosecution also presented photographs of a tattoo on Henson's back and a tattoo on Brown's arm, each of which included insignia Officer Luna testified indicated association with the gang. Police officers also discovered in Penister's apartment a sweatshirt with a prominent logo representing an American film and entertainment studio displaying the initials "W.B.," which Penister stated Brown wore on the day of the Stubbs and Keaton shooting. Officer Luna testified members of the West Boulevard Crips frequently wear clothing with the logo.

to kill [the victim], intended to facilitate that plan, and aided [fellow members of gang] in committing the killing"]; see also *People v. Nguyen*, *supra*, 61 Cal.4th at p. 1054 ["'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.'"]; *People v. Montano* (2022) 80 Cal.App.5th 82, 101 [same].)

Moreover, Henson had a motive to kill Stubbs and Keaton. (See *People v. Smith* (2005) 37 Cal.4th 733, 741 ["evidence of motive is often probative of intent to kill"]; *People v. Superior Court* (2023) 88 Cal.App.5th 26, 36 [same].) Stubbs was a member of a rival gang. As Officer Luna testified, targeting a rival gang member would elevate the status of the West Boulevard Crips and, as a motivation for the shooting, enhance the reputation of the people who committed the shooting. That Henson accompanied Brown during an assault on another rival gang member two days later further supported the superior court's finding Henson knew Brown intended to kill Stubbs and Keaton. (See *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th at p. 727 ["Evidence of the defendant's gang affiliation," including the gang's "rivalries," is relevant to prove "motive," "modus operandi," and "specific intent"]; *People v. Nguyen*, *supra*, 61 Cal.4th at p. 1055 [expert witness's testimony that "gang members . . . would drive around 'hunting for their rivals'" and that the defendant's gang was in a state of war with the victim's gang supported the inference the defendant in the backseat of a car involved in a drive-by shooting "was aware of the impending shooting and acted to facilitate it"].) The superior court could also reasonably infer that, because Henson provided the gun and ammunition Brown used to commit the shooting,

Henson's conduct assisted Brown in committing the murder and attempted murder. (See *People v. Pettie* (2017) 16 Cal.App.5th 23, 53 [jury could reasonably infer members of a gang, "by participating in the assault on [the victim], encouraged [fellow gang members] to fire gunshots with the intent to facilitate his commission of attempted murder"].)

Henson argues there was "no proof [he] was in the red car," "no proof that [he] gave the gun to Brown," and no proof he "gave the gun to Brown with the specific intent that Brown would use the gun to kill members of a rival gang." That may be Henson's version of events, but it is not a fair characterization of the evidence, particularly when viewed in the light most favorable to the superior court's findings. The reviewing court "'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Vargas*, *supra*, 84 Cal.App.5th at p. 951.) True, no eyewitness specifically testified Henson was in the car with Brown when Brown shot Stubbs and Keaton. But such evidence was not required. (See *People v. Navarro* (2021) 12 Cal.5th 285, 339 [""Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence."""].)

Nor, on the issue of intent, was there an admission by Henson or direct testimony that Henson was aware Brown intended to kill Stubbs and Keaton. But such evidence was not required either. As the Supreme Court has explained, for "a specific intent element of a crime . . . [e]vidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) The superior court could reasonably infer Henson knew of

and shared Brown's intent to kill, given their joint membership in the same gang and the circumstances surrounding the crime. (See *People v. Avila* (2009) 46 Cal.4th 680, 701 ["'[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may . . . be inferred from the defendant's acts and the circumstances of the crime.'"].) We do not second-guess reasonable inferences drawn by the superior court. (See *Manibusan*, at p. 87 ["[w]here the circumstances reasonably justify the trier of fact's findings," that the "circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal"].)

Henson also contends that, because he was convicted of first degree murder and "attempted premeditated murder,"[4] the prosecution had to prove he "personally had the mens rea of premeditation and deliberation," which the superior court did not find. Henson mischaracterizes the prosecution's burden when opposing a petition under section 1172.6. The "prosecution meets its burden under section 1172.6 if it proves beyond a reasonable doubt that the defendant 'is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019.' . . . [¶] The statute does not detail eligible degrees of murder. . . . It treats all murder as a single, generic crime and requires resentencing when a defendant could not now be convicted of murder, generically." (*People v. Didyavong* (2023) 90 Cal.App.5th 85, 96; see *People v. Gonzalez*

---

[4]     "[A]ttempted premeditated murder and attempted unpremeditated murder are not separate offenses. Attempted murder is not divided into different degrees." (*People v. Favor* (2012) 54 Cal.4th 868, 876.)

(2023) 87 Cal.App.5th 869, 880-881.)  If the petitioner is entitled to relief, "the court vacates the murder conviction and redesignates it as the target offense or the underlying felony. . . . [T]he statute provides no mechanism," however, "for the court to *reduce* a first degree murder conviction to second degree." (*Didyavong*, at p. 96; see *Gonzalez*, at p. 880.)

At the evidentiary hearing, the prosecution proved Henson was guilty of murder and attempted murder under principles of aiding and abetting liability that remain valid after the changes to sections 188 and 189.  No more was required.[5]

C.     *Any Error in Relying on Our Opinion in* Brown *Was Harmless*

Henson argues the superior court erred "by failing to limit its reliance" on our opinion in *Brown*, *supra*, B162138, "to the procedural history."  (See § 1172.6, subd. (d)(3) [at the evidentiary hearing "[t]he court may . . .consider the procedural history of the case recited in any prior appellate opinion"].)  We doubt the superior court erred in relying on our opinion.  The superior court did not, for example, rely on the factual summary in the opinion in lieu of the trial testimony.  (Cf. *People v. Beaudreaux* (2024) 100 Cal.App.5th 1227, 1238 ["'by *allowing* consideration of "'the procedural history'" in a prior appellate opinion, the Legislature intended to *prohibit* consideration of "the

---

[5]     Because we affirm the order denying the petition on the ground substantial evidence supported the court's finding Henson knew of and shared Brown's specific intent to kill, we do not consider Henson's challenge to the court's finding Henson acted with implied malice.

19

factual summar[y]'" in an appellate opinion"]; *People v. Bratton* (2023) 95 Cal.App.5th 1100, 1113 [same].) Instead, the superior court discussed the grounds stated in our opinion for affirming Brown's and Henson's convictions, including that the trial court's erroneous instruction on the natural and probable consequence doctrine was harmless because the verdict forms reflected the jury necessarily convicted Brown and Henson of murder and attempted murder under a valid theory of then-existing law.

Henson, however, forfeited the argument by failing to object in the superior court. The Legislature's amendments to former section 1170.95 adding the language that states "[t]he court may . . . consider the procedural history of the case recited in any prior appellate opinion" became effective January 1, 2022. (Former § 1170.95, subd. (d)(3), Stats. 2021, ch. 551, § 2.) The evidentiary hearing on Henson's section 1172.6 petition occurred in June 2022. At the hearing, the superior court read its ruling to the parties, including the portion of its decision discussing the grounds for affirming the convictions stated in our opinion in *Brown*. By failing to object to the court's consideration of our opinion, Henson forfeited his challenge on appeal. (See *People v. Vance* (2023) 94 Cal.App.5th 706, 714 ["when an appellate opinion is admitted at an evidentiary hearing under section 1172.6, without objection," a party forfeits any challenge to the superior court's consideration of the opinion]; *People v. Myles* (2021) 69 Cal.App.5th 688, 696 [defendant forfeited his challenge to admissibility of evidence admitted at evidentiary hearing under former section 1170.95 by failing to object].)

In any event, to the extent the superior court erred in considering the opinion in *Brown*, any error was harmless. Even where the superior court relies on improper evidence when

denying a petition under section 1172.6, "reversal is not required unless it is reasonably probable the defendant would have obtained a more favorable outcome had the evidence been excluded." (*People v. Myles*, *supra*, 69 Cal.App.5th at p. 706; see *People v. Vance*, *supra*, 94 Cal.App.5th, at p. 714 [harmless error standard in *People v. Watson* (1956) 46 Cal.2d 818 applies to claim that superior court improperly considered an appellate opinion at the evidentiary hearing]; see also *People v. Epps* (2001) 25 Cal.4th 19, 29 ["the *Watson* test for harmless error applies" to the denial of a right that "is purely a creature of state statutory law"].)

It is not reasonably probable the superior court would have granted Henson's petition had it not considered our opinion in *Brown*. The court found that "the facts provided from the trial testimony establish proof beyond a reasonable doubt that [Henson] had the intent to kill." In explaining the basis for its finding, the court cited only evidence from the trial: the testimony of Penister and Officer Luna, Stubbs's and Keaton's statements to police officers after they were shot, the circumstances surrounding Brown's and Henson's arrests, and the ballistics evidence. The court's discussion of our grounds for affirming the convictions in *Brown* did not affect the outcome of the proceedings.

21

## DISPOSITION

The order is affirmed.


                                        SEGAL, J.

We concur:


          MARTINEZ, P. J.



          RAPHAEL, J.*

---

*        Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.